IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

SVETLANA LOKHOVA,            )
                              )
           Plaintiff,          )
                              )
           v.                )      1:19-cv-632 (LMB/JFA)
                              )
STEFAN A. HALPER, et al.,     )
                              )
           Defendants.      )

## MEMORANDUM OPINION

Before the Court is Svetlana Lokhova's ("Lokhova" or "plaintiff") three-count Amended Complaint [Dkt. No. 52] brought against Dow Jones & Company, Inc. d/b/a the Wall Street Journal ("the Journal"), the New York Times Company ("the New York Times"), WP Company, LLC d/b/a the Washington Post ("the Post"), and NBCUniversal Media, LLC d/b/a MSNBC ("NBCUniversal") (collectively, "the media defendants"), Stefan A. Halper ("Halper"), and MSNBC contributor Malcolm Nance ("Nance"),[1] alleging defamation (Count I); common law conspiracy (Count II); and tortious interference with contracts and business expectancies (Count III). Halper and the media defendants have moved to dismiss the Amended Complaint, and Halper has filed a motion for sanctions and a motion for leave to file a supplemental memorandum in support of sanctions. Plaintiff has responded to the motions, defendants have filed reply briefs, and oral argument has been held. For the reasons that follow, the motions to

---

[1] Although Nance was added as a defendant in the Amended Complaint on August 29, 2019, plaintiff has made no effort to serve him with that complaint. Plaintiff's failure to serve Nance was raised at the October 25, 2019 hearing, which placed Lokhova and her counsel on clear notice that service was required. As such, in addition to the substantive reasons discussed in this Memorandum Opinion, the complaint against Nance will also be dismissed because by not making any effort to serve Nance, plaintiff has apparently abandoned her claim against him.

dismiss will be granted, and Halper's motion for sanctions and motion for leave to file a supplemental memorandum in support of sanctions will be denied without prejudice.

## I. BACKGROUND

### A. Procedural History

On May 23, 2019, Lokhova filed her initial complaint. [Dkt. No. 1]. On August 8, 2019, all served defendants moved to dismiss the complaint [Dkt. Nos. 22, 31, 38, 41, 44], and Halper filed a motion for sanctions. [Dkt. No. 35]. In response, Plaintiff filed the pending Amended Complaint [Dkt. No. 52], which among other changes added Nance as a defendant. In response, the first round of motions to dismiss were denied as moot. [Dkt. No. 53]. All defendants, except for Nance, subsequently filed new motions to dismiss. [Dkt. Nos. 58, 61, 63, 64, and 68].

### B. The Amended Complaint[2]

The 73-page Amended Complaint ("complaint") alleges a wide-ranging conspiracy among the defendants to defame and injure Lokhova and others. Specifically, the complaint alleges that Halper colluded with the media defendants and others to "leak false statements about Plaintiff as part of a nefarious effort to smear General [Michael] Flynn and fuel and further the now debunked and dead narrative that the Trump campaign colluded with Russia." Id. ¶ 20. The complaint asserts that Halper intentionally misrepresented that Lokhova was a "Russian spy" who "had an affair with General Flynn on the orders of Russian intelligence" and "compromised

---

[2] In considering a motion to dismiss, courts must presume that the facts alleged in the complaint are true. See, e.g., Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555-56 (2007). This presumption does not extend to hyperbole. See Wikimedia Found. v. Nat'l Sec. Agency, 857 F.3d 193, 208 (4th Cir. 2017) ("legal conclusions pleaded as factual allegations, unwarranted inferences, unreasonable conclusions, and naked assertions devoid of further factual enhancement are not entitled to the presumption of truth") (internal quotation marks and citation omitted).

General Flynn." Id. ¶ 4.[3] The complaint further alleges that "Halper, with the full knowledge and acquiescence of the media [d]efendants," used the media defendants' platforms and "massive public followings" "as a bullhorn and an echo chamber to amplify and republish the defamation to an unprecedented and unimaginable degree," id. ¶ 20, and that all defendants acted with actual malice, id. ¶ 189.

Lokhova is a United Kingdom citizen who was born in Russia. Id. ¶ 12. The complaint asserts that Lokhova "is not and never has been a Russian spy or an agent of Russian intelligence or any branch or agency of the Russian government." Id. ¶ 25. She began studying at Cambridge University in 1998, where she earned a Bachelor of Arts degree and a Masters' degree in history. Id. ¶ 12. Her Masters dissertation focused on the founder of the Soviet intelligence service. Id. As part of her studies, Lokhova "was instructed to travel to Moscow, where she obtained declassified documents from RGASPI, the former Communist Party archive." Id. ¶ 29.

In 2004, Lokhova began a doctoral program in Soviet Intelligence Studies at Cambridge, but she left the program later that year to pursue a career in finance. Id. ¶ 29, 30. Among other entities, Lokhova worked for what appears to be a Russian bank, Troika Dialog UK Ltd. Id. ¶ 30. She returned to Cambridge sometime around 2012 and began participating in the Cambridge Intelligence Seminar ("the Seminar"), an academic forum focusing on intelligence issues. Id.

---

[3] Although Flynn is not a party to this action, the complaint frequently mentions him. Indeed, some portions of the complaint do not focus on Lokhova, but instead discuss Flynn, Halper, President Donald J. Trump, and others. For example, one paragraph of the complaint states that during a BBC radio program in May 2017, "Halper misrepresented that 'people are deeply concerned about the erratic nature of this White House.'" Id. ¶ 144. Such unnecessary and irrelevant statements suggest that political motives, more than legitimate jurisprudential concerns, drive this litigation.

¶ 32, 33. Halper, whom the complaint refers to as a "counterintelligence operative," id. ¶ 13 n.4; a spy, id. ¶ 1; and a "ratf\*\*\*er," id., was also a member of the Seminar. Id. ¶ 33.[4]

In January 2014, Richard Dearlove, the former director of British intelligence, and Christopher Andrew, Lokhova's then-mentor, invited Lokhova to a dinner at Dearlove's house on February 28, 2014, which General Flynn, who was then the director of the Defense Intelligence Agency ("DIA"), was also expected to attend. Id. ¶ 42. The "purpose of the dinner was to promote the program that was to become the 'Cambridge Security Initiative' (CSI), a group chaired by Dearlove." Id. ¶ 43.[5] Plaintiff claims that all guests were "pre-cleared in advance with the DIA." Id. ¶ 137. Approximately twenty people attended the dinner. Id. ¶ 45. At the beginning of the dinner, Flynn briefly introduced himself to Lokhova and another Cambridge fellow. Id. ¶ 44. Lokhova did not sit next to Flynn or approach him. Id. ¶ 45, 137. At the end of the dinner, "Andrew invited Lokhova to address General Flynn," which led to a "brief, **public** group exchange with General Flynn and Dearlove." Id. ¶ 46 (underlined and bolded in original). Lokhova "showed Flynn, Dearlove, and others in the group a discovery from the official Stalin Archive," namely a postcard from Stalin displaying "a photograph of an 'erotic statue'" and containing words that "are very *un Stalin* like," which "makes people re-examine how they think

---

[4] Both the original complaint and the Amended Complaint began with this extremely offensive and inappropriate characterization of Halper. That sentence, and many other unnecessary statements in the complaint, are examples of plaintiff's counsel's over-heated rhetoric, which has led another judge in this district to chastise him, on threat of sanctions, for engaging in ad hominem attacks against another defendant. Steele v. Goodman, No. 3:17-cv-601, 2019 WL 3367983, at \*3 (E.D. Va. July 25, 2019).

[5] The complaint is somewhat unclear as to whether Lokhova was a graduate student as of the 2014 dinner, stating that Lokhova "rejoin[ed] academia" at some point before the dinner, id. ¶ 33, and also describing one object of CSI as "help[ing] support graduate students, such as Lokhova, while they were studying at Cambridge," id. ¶ 43; however, in a statement to a New York Times reporter cited in the complaint, Lokhova indicated that she was "not a graduate student at the time" of the dinner, id. ¶ 137.

about 'Uncle Joe.'" Id. ¶ 137 (emphasis in original). Lokhova told a reporter from the New York Times that the conversation lasted "ten mins tops," id. ¶ 137, while her partner David North told the Journal that it was a "twenty-minute public conversation." Id. ¶ 107. The complaint alleges that "[n]o one expressed any concerns of any kind" about the events of this dinner, which Halper did not attend, id. ¶ 46-47, and that Halper knew that nothing concerning occurred at the dinner because a Cambridge colleague told him as much. Id. ¶ 47 n.7. The complaint further asserts that Dearlove "would never have allowed Lokhova to attend an event with General Flynn . . . if Dearlove had had any concerns with Lokhova," id. ¶ 42, and that Lokhova and Dearlove continued to engage professionally without issue in the years following the dinner, see, e.g., id. ¶ 61. The complaint includes a photo of Dearlove shaking hands with Flynn at the dinner. Id. ¶ 49.

After the dinner, "Andrew asked Lokhova to stay in occasional contact with General Flynn," in the hopes that "Flynn might speak again at the Seminar or do business with CSI." Id. ¶ 50. Lokhova "had occasional email contact with General Flynn after February 2014," and "Andrew was copied or saw all the email exchanges, which were general in nature." Id. The complaint states that Flynn did not sign any of these emails "General Misha," did not invite Lokhova to Moscow, and did not ask Lokhova to serve as a translator. Id. ¶ 51-53. Apart from the 2014 dinner and these emails, Lokhova has not spoken to or met with Flynn. Id. ¶ 137.

In December 2015, Flynn traveled to Moscow. Id. ¶ 62. Lokhova "never discussed going to Moscow with General Flynn" and "did not even know about" the trip. Id. ¶ 64. In "late 2015, General Flynn informally became an advisor to the Trump presidential campaign." Id. ¶ 65. "Sometime in early 2016, the FBI began to investigate Flynn 'based on his relationship with the Russian government.'" Id. ¶ 66 n.10.

In January 2016, Andrew invited Lokhova and her partner to have dinner with Halper and his wife. Id. ¶ 68. The complaint alleges that Halper wanted to "probe [Lokhova] for information relating to Flynn." Id. ¶ 70. Lokhova declined the invitation, which "outraged" Andrew, after which "relations deteriorated" between the two, resulting in Andrew "walk[ing] away from [a] lucrative publishing contract" he and Lokhova had with Basic Books and Penguin. Id. ¶¶ 60, 72. Later that year, Lokhova obtained other publishing contracts with Norton US and Harper Collins for her book "The Spy Who Changed History," id. ¶ 78, which was ultimately published in June 2018, id. ¶ 12 (linking to https://www.svetlanalokhova.com/biography).

The complaint alleges that in July 2016, Halper resigned from his role as co-convener of the Seminar "to assist the FBI in its covert investigation of the Trump campaign." Id. ¶ 76 n. 11. The complaint further alleges that after the November 2016 election, "Halper seeded" media outlets "with false and defamatory statements about Lokhova and General Flynn – statements that were eagerly republished with no evidentiary support and for the sole purpose of advancing the sensational and false narrative." Id. ¶ 82. In December 2016, non-defendant the Financial Times published an article titled "Intelligence Experts Accuse Cambridge Forum of Kremlin Links." Id. ¶¶ 83-84. The article stated, in part, that Dearlove and Halper stepped down from the Seminar due to perceived Russian influence on the group. Id. ¶ 84. The complaint claims that the alleged "Russian influence" was intended to refer to Lokhova, id. ¶ 85, and that neither Halper nor Dearlove genuinely had any concern about any such influence. Instead, Halper's "misrepresentations and propaganda . . . were designed to seed the false narrative about Lokhova." Id. ¶ 86.

In January 2017, Flynn was appointed National Security Advisor, but he resigned less than a month later. Id. ¶¶ 90, 91. The complaint alleges that Halper was the source for, or

conspired with the source for, a variety of articles discussing Flynn published between 2016 and 2017 by non-defendant British media outlets,[6] and that these articles stated or implied false and defamatory information concerning Lokhova, including, but not limited to, that Flynn asked Lokhova to travel with him as a translator to Moscow, id. ¶ 95; that Flynn signed an email to Lokhova as "General Misha," id.; that United States intelligence officials were concerned about Flynn's appointment as National Security Advisor because of his encounter with a "woman who had trusted access to Russian spy agency records," id. ¶ 121; that Flynn's resignation from his National Security Advisor position was linked to his "meeting with an Anglo-Russian banker once falsely dubbed Crazy Miss Cokehead," id. ¶ 127; and that Flynn had "struck up a friendship at a Cambridge dinner with a Russian banker turned academic," id. ¶ 127.

On April 1, 2017, in response to one of these articles, defendant Nance tweeted "BREAKING: There it is. Flynn poss caught in FSB honeypot w/female Russian Intel asset. Nance's Law dude!  reporting!" Id. ¶ 174. In defining "Nance's Law," Nance tweeted "Nance's Law of Intelligence Kismet: Coincidence Takes a Lot of Planning! Like incidentally running into a Lovely lady with all GRU's secrets." Id. The next day, MSNBC contributor Joy Reid retweeted Nance's first tweet. Id. Nance also appeared on an MSNBC program on May 6, 2017, on which

---

[6] The complaint references a variety of articles allegedly containing false and defamatory information, including a February 19, 2017 Sunday Times of London article titled "Impulsive General Misha Shoots Himself in the Foot," id. ¶ 94; a March 31, 2017 Guardian article titled "Michael Flynn: New Evidence Spy Chiefs Had Concerns about Russian Ties," id. ¶ 119; a March 31, 2017 Daily Mail article titled "Disgraced Trump Aide, and Questions over His Meeting with Cambridge Historian at Intelligence Seminar Raised Concerns among British and US Security Chiefs," id. ¶ 125; and an April 2, 2017 Daily Telegraph article titled "Cambridge University Dragged into Row over Donald Trump's ex-spy chief's links to Russia," id. The complaint alleges that these articles have been retweeted and otherwise discussed on the internet in the years since their initial publication. Because these articles were published by media outlets that are not defendants in this civil action, they are only relevant to the extent of Halper's alleged involvement.

he stated, among other things, that Flynn may have had contact with a "Russian intelligence officer" at Cambridge. Id. ¶ 175 (linking to https://www.msnbc.com/am-joy/watch/nance-was-flynn-recruited-by-foreign-powers-937950787864). The complaint asserts that in issuing these tweets and appearing on this program, Nance was acting as an "authorized agent[]" of NBCUniversal, and that NBCUniversal is liable for his statements through the doctrine of respondeat superior. Id. ¶ 173.

The complaint claims that after Halper gave the Journal, the New York Times, and the Post false information about Lokhova's "relationship[]" with Flynn, these defendants contacted Lokhova and other Cambridge academics in February and March 2017 and were told that any allegations about her "relationship" with Flynn were false. Id. ¶¶ 101-108, 133, 134. The complaint alleges that in response to this information, David Ignatius, a Post columnist, "represented that he had no interest in publishing anything, as there was nothing to publish." Id. ¶ 108.

The Journal published an article on March 17, 2017 titled "Michael Flynn Didn't Report 2014 Interaction with Russian-British National." Id. ¶ 109. The complaint claims that the article was "intentionally laden with false facts," and that the "gist and defamatory implication . . . was that Lokhova engaged in unlawful or suspicious interactions with General Flynn on behalf of the Russia[n] government that should have been reported to the DIA." Id. ¶ 111. The complaint alleges that the article was "republished thousands of times on Twitter,"[7] id. ¶ 112, and relied

---

[7] The complaint only specifically mentions four tweets referring to the Journal article, three of which appear to have been published in 2017. The link for the fourth tweet is inoperative. The complaint also includes a link to a Twitter webpage that appears to list instances in which Twitter users have linked to the Journal article in tweets, which shows that Twitter users have issued tweets linking to the Journal article as recently as May 23, 2019. Id. ¶ 112 (linking to https://twitter.com/search?q=https%3A%2F%2Fwww.wsj.com%2Farticles%2Fmike-flynn-didnt-report-2014-interaction-with-russian-british-national-1489809842&src=typd ).

Case 1:19-cv-00632-LMB-JFA   Document 90   Filed 02/27/20   Page 9 of 57 PageID# 1619

upon by other media outlets, id. ¶¶ 113, 114, and that the Journal has refused to retract or correct the article, in spite of repeated requests, id. ¶ 116.

On May 12, 2017, the BBC published an interview with Lokhova "in which Lokhova explained the truth about what happened at the Cambridge dinner in February 2014 and her limited and infrequent interactions with General Flynn." Id. ¶ 135. Lokhova sent this story to a reporter at the New York Times, and also provided written statements explaining her side of the story. Id. ¶ 136, 137. After this interaction, the New York Times "shelved [a planned] story." Id. ¶ 138.

The complaint goes on to allege that in May 2017, "the FBI opened an investigation into whether President Trump was secretly working on behalf of Russia against American interests." Id. ¶ 142. That month, John O. Brennan, former director of the Central Intelligence Agency, testified before Congress that he was "worried by a number of the contacts that the Russians had with U.S. persons," because he "[knew] what the Russians try to do. They try to suborn individuals and they try to get individuals, including U.S. persons, to act on their behalf either wittingly or unwittingly," id. ¶ 146. Although Brennan did not refer to Lokhova by name, the complaint theorizes that he "was expressly referring to Flynn and Lokhova," and that Halper was the source of Brennan's information. Id. ¶ 147. The Post published an article on May 23, 2017, discussing Brennan's testimony. Id. ¶ 146.

On May 18, 2018,[8] the New York Times published an article entitled "FBI Used Informant to Investigate Russia Ties to Campaign, Not to Spy, as Trump Claims,"[9] for which the complaint claims Halper was the source. Id. ¶¶ 155, 157. The article was 1,357 words long, of which only the following 164-word discussion is relevant to this litigation:

> The informant also had contacts with Mr. Flynn, the retired Army general who was Mr. Trump's first national security adviser. The two met in February 2014, when Mr. Flynn was running the Defense Intelligence Agency and attended the Cambridge Intelligence Seminar, an academic forum for former spies and researchers that meets a few times a year. According to people familiar with Mr. Flynn's visit to the intelligence seminar, the source was alarmed by the general's apparent closeness with a Russian woman who was also in attendance. The concern was strong enough that it prompted another person to pass on a warning to the American authorities that Mr. Flynn could be compromised by Russian intelligence, according to two people familiar with the matter. Two years later, in late 2016, the seminar itself was embroiled in a scandal about Russian spying. A number of its organizers resigned over what they said was a Kremlin-backed attempt to take control of the group.

Id. ¶ 158. The New York Times tweeted links to the article on May 18 and 19, 2018, and others have linked and referred to the article since then. Id. ¶ 163. The New York Times also hyperlinked to this article in an April 9, 2019 article it published. Id. ¶ 5.

On May 18, 2018, one of the authors of the New York Times article appeared on MSNBC's Rachel Maddow Show and discussed with Maddow the allegations in the article. Id. ¶ 162. That same day, Post reporter Robert Costa appeared on MSNBC's The 11th Hour with Brian Williams. Id. ¶ 164. During the broadcast, Williams discussed the allegations in the New York Times article, and another guest stated that it "raises red flags" "when you have a Russian

---

[8] The link to the article in the complaint states that "[a] version of this article appears in print on May 19, 2018, Section A, Page 1 of the New York edition with the headline: Trump Distorts Role of Informant in Campaign." Id. ¶ 155 (linking to https://www.nytimes.com/2018/05/18/us/politics/trump-fbi-informant-russia-investigation.html).

[9] A complete copy of the online version of the April 9, 2019 New York Times article is attached as Attachment A.

woman getting close to" Flynn and "people worried that he could be compromised." Id. (linking

to http://www.msnbc.com/transcripts/11th-hour-with-brian-williams/2018-05-18).

On June 5, 2018, the Post published a 2,262-word story titled "Cambridge University

Perch Gave FBI Source Access to Top Intelligence Figures – and a Cover as he Reached Out to

Trump Associates." Id. ¶ 165. The complaint quotes the following excerpt from this article:

> During this period, Halper formed a close bond with Dearlove, the now-retired head of
> MI6.
>
> Together, they launched the Cambridge Security Initiative, which produced research for
> governments and other clients, modeled in part after the Rand Corporation.
>
> Together, the two also became active in the Cambridge Intelligence Seminar, established
> by another Cambridge professor, Christopher Andrew, formerly an official historian for
> the British domestic intelligence service, MI5.
>
> All three were present for a 2014 visit by Flynn, then head of the Defense Intelligence
> Agency, who had agreed to speak to the Intelligence Seminar while traveling for Defense
> Department-related activities. During a dinner Flynn attended, Halper and Dearlove were
> disconcerted by the attention the then-DIA chief showed to a Russian-born graduate
> student who regularly attended the seminars, according to people familiar with the
> episode. Both the student and a Defense Department official traveling with Flynn have
> denied that anything inappropriate occurred.

Id. ¶ 170.[10] The complaint describes two "falsehoods" in the article: (1) that Halper "attended"

the February 2014 dinner, and (2) that Halper and Dearlove were "disconcerted" by the attention

Flynn paid a Russian-born graduate student who regularly attended the seminars. Id. ¶ 171.

Lokhova claims that the Post knew these statements were false because she told them so and

---

[10] A complete copy of the online version of the June 5, 2018 Post article is attached as
Attachment B. The excerpt included in the complaint contains three minor differences from the
online version. Specifically, the excerpt in the complaint states that Dearlove is the now-retired
head of "British intelligence service MI6," while the full article simply states that he is the now-
retired head of "MI6." The excerpt in the complaint also spells out the term "Rand Corporation,"
while the full version of the article refers to the "Rand Corp." Finally, the quote in the complaint
states "Both the student and a Defense Department official traveling with Flynn have denied that
anything inappropriate occurred," while the full version of the article omits the word "[b]oth."
None of these differences have any substantive effect on the meaning of the article.

shared a copy of a May 2018 interview she had done with the Times of London setting out her side of the story, and because a Post reporter had previously investigated and "determined there was nothing to the story." Id. ¶¶ 167-169. The Post article has been retweeted after its initial publication, including by Post reporter Costa and the Post itself. Id. ¶¶ 5, 172.

The complaint alleges that MSNBC contributor Nance issued additional tweets concerning Lokhova in 2018. On July 16, 2018, Nance tweeted: "NRA-Russia liaison agent Maria Butina arrested. I wrote half a chapter about her in @Plot2Destroy moving fm Siberian furniture salesgirl to Russian 'gun rights@ director in America overnight. #SpyHard." Id. ¶ 178 (linking to https://twitter.com/MalcolmNance/status/1018954261391118338). One response to this tweet asked: "A Sparrow?" Nance responded: "No. The technical name for sexy women Agents is a 'Svetlana'. Smart ones are 'Natashas.'" Id.

On July 18, 2018, Nance posted a tweet in response to an article about Maria Butina, stating: "The technical term for Butina is that she could have been a 'Honeypot'. Her access tools were 'exotic charms' & ability to 'handle a gun'. #MataHari #NationalRussian Association." Id. ¶ 179 (linking to https://twitter.com/MalcolmNance/status/101964 0292004200450). A response to this tweet asked: "Flynn and Lokhova?" to which Nance responded the next day, "Very likely." Id. ¶ 179.[11]

---

[11] During the October 25, 2019 hearing, Lokhova's counsel asserted that Nance had also made comments relating to Lokhova during a December 2018 television program on MSNBC. It appears that counsel may have been referring to the YouTube video referenced in paragraph 173 of the Amended Complaint, https://www.youtube.com/watch?v=EfIfl2tvvU8, which was published on December 18, 2018. The video is three minutes long, and features Nance discussing Flynn on MSNBC. The video references Flynn, and contains statements including that "within the intelligence community, the thought was Michael Flynn may have been a turned agent to Russian intelligence," although "it was never confirmed"; however, the video does not reference Lokhova or Cambridge, and therefore is an example of this complaint's consistent reliance on statements that have little to nothing to do with Lokhova.

As a result of defendants' actions, Lokhova claims she has suffered damages including, but not limited to, humiliation, mental suffering, reputational injury, lost income, lost academic and professional opportunities, as well as lost book contracts. Id. ¶ 190, 195, 200. She seeks $25 million in compensatory damages, $350,000 in punitive damages, pre- and post-judgment interest, attorneys' fees and costs, and a jury trial. Id. at 72-73.

## II. DISCUSSION

### A. Standard of Review

All served defendants have filed motions to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6).[12] Under this rule, a complaint "must be dismissed when a plaintiff's allegations fail to state a claim upon which relief can be granted." Adams v. NaphCare, Inc., 244 F. Supp. 3d 546, 548 (E.D. Va. 2017). To survive a Rule 12(b)(6) motion to dismiss, the complaint must allege facts that "raise a right to relief above the speculative level" and "state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 555, 570. "[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and

---

[12] Halper also argues that Lokhova's complaint should be dismissed under Rule 12(b)(1) on multiple grounds, including that she lacks standing to seek damages because she filed for bankruptcy in the United Kingdom, and as a result only her bankruptcy trustee has standing to sue for her financial losses. Lokhova responds that Halper's arguments with respect to her bankruptcy depend on unauthenticated documents, cannot be considered without converting the motion into one for summary judgment, and are in any event lacking in merit. Although courts normally address Rule 12(b)(1) jurisdictional issues before reaching Rule 12(b)(6) issues, the Supreme Court has held that "a federal court has leeway to choose among threshold grounds for denying audience to a case on the merits" because "jurisdiction is vital only if the court proposes to issue a judgment on the merits." Sinochem Int'l Co. v. Malaysia Intern. Shipping Co., 549 U.S. 422, 431 (2007) (internal quotation marks and citations omitted). Here, Halper is but one of five served defendants, and he is the only one to raise Rule 12(b)(1) issues. In the interests of efficiency and because this matter comes before the Court on motions to dismiss rather than motions for summary judgment, the Court will resolve these motions on grounds common to all defendants under Rule 12(b)(6).

conclusions, and a formulaic recitation of the elements of a cause of action will not do."

Twombly, 550 U.S. at 555 (internal quotation marks and citations omitted).

In addressing a motion to dismiss, a court must assume the facts alleged in the complaint are true and construe the factual allegations in the plaintiff's favor, Robinson v. Am. Honda Motor Co., 551 F.3d 218, 222 (4th Cir. 2009); however, a court "is not bound by the complaint's legal conclusions" or conjectures. Id. Without converting a motion to dismiss into a motion for summary judgment, a court may consider the attachments to the complaint, documents incorporated in the complaint by reference, and documents "attached to the motion to dismiss, so long as they are integral to the complaint and authentic." Sec'y of State for Defence v. Trimble Navigation Ltd., 484 F.3d 700, 705 (4th Cir. 2007); see also Healey v. Abadie, 143 F. Supp. 3d 397, 401 (E.D. Va. 2015). Courts may also take judicial notice of items in the public record. Hall v. Virginia, 385 F.3d 421, 424 n.3 (4th Cir. 2004).

B. Analysis[13]

1. The statute of limitations for Count I

Defendants first argue that most of Lokhova's claims are time-barred. Because this civil action is one of the "relatively rare" ones in which facts sufficient to rule on the affirmative statute of limitations defense are alleged on the face of the complaint or are apparent on the face of documents integral to the pleadings and incorporated by reference into the complaint,[14] it is appropriate to reach this issue on a Rule 12(b)(6) motion. See Goodman v. Praxair, Inc., 494 F.3d 458, 464 (4th Cir. 2007); Edwards v. Schwartz, 378 F. Supp. 3d 468, 522–24 (W.D. Va.

---

[13] Defendants raise many arguments in support of their motions to dismiss, including that the Virginia Immunity Statute bars Lokhova's defamation and tortious interference claims. The Court need not address all of them, because a few are dispositive.

[14] Although the parties dispute whether the various media articles referenced in the complaint are defamatory, there does not appear to be a dispute as to the authenticity of the articles.

2019) (reaching the affirmative defense of substantial truth at the motion to dismiss stage based on the allegations in the complaint and an exhibit attached to the motion to dismiss, which was incorporated by reference into the plaintiff's pleadings).

The parties agree that the statute of limitations for defamation in Virginia is one year.[15] "Any cause of action that a plaintiff has for defamation accrues on the date that the defamatory acts occurred," Askew v. Collins, 283 Va. 482, 487 (2012), which in this case would be the date the allegedly defamatory statements were published, see Hatfill v. New York Times Co., 416 F.3d 320, 334 (4th Cir. 2005). Therefore, because this lawsuit was first filed on May 23, 2019, only materials published between May 23, 2018 and the present can be the basis for liability. Accordingly, defamation claims based on the following original publications are time-barred: the March 17, 2017 Journal article; the April 2017 Nance tweets; the May 2017 MSNBC program; the May 18, 2018 Times article; the May 18 and 19, 2018 tweets by the New York Times; the statements made during the May 18, 2018 Rachel Maddow Show and The 11th Hour with Brian

---

[15] There is a dispute among the parties as to whether Virginia, New York, or District of Columbia law should apply to the substantive issues in this civil action. This dispute is of little consequence in the statute of limitations context, because regardless of which law applies to the substantive issues in this action, "the applicable statute of limitations . . . [is a] procedural matter[] governed by the law of the forum state, namely Virginia." Lewis v. Gupta, 54 F. Supp. 2d 611, 616 (E.D. Va. 1999). Even if Virginia law did not apply, the one-year statute of limitations for defamation claims is the same in all three jurisdictions. Va. Code § 8.01-247.1 ("Every action for injury resulting from libel, slander, insulting words, or defamation shall be brought within one year after the cause of action accrues); D.C. Code § 12-301 ("Except as otherwise specifically provided by law, actions for the following purposes may not be brought after the expiration of the period specified below from the time the right to maintain the action accrues: . . . . (4) for libel, slander . . . . -- 1 year"); N.Y. C.P.L.R. § 215 ("The following actions shall be commenced within one year: . . . . 3. an action to recover damages for . . . libel, slander").

Williams; and all statements Halper allegedly made to any media outlets when serving as a source for articles published before May 23, 2018.[16]

Lokhova does not contest that these original publications of the allegedly defamatory materials occurred before May 23, 2018. Instead, she argues that each time the allegedly offending articles have been tweeted, retweeted, hyperlinked, referenced, or otherwise relied upon (hereinafter, "electronic references"), the statute of limitations begins anew. This argument is unpersuasive.[17]

a.   The single publication rule

Defendants argue that even to the extent there have been electronic references to, or distribution of, the allegedly defamatory materials since May 22, 2018, those occurrences did not retrigger the statute of limitations under the single publication rule, "which permits only one cause of action to be maintained for any single publication, even if heard or read by two or more third persons." Katz v. Odin, Feldman & Pittleman, P.C., 332 F. Supp. 2d 909, 918 (E.D. Va. 2004) (citing Morrissey v. William Morrow Co., 739 F.2d 962 (4th Cir. 1984)). "Although subsequent distribution of a defamatory statement may continue to increase plaintiff's compensable damages, it does not create independent actions or start the statute of limitations running anew." Katz, 332 F. Supp. 2d at 918. The rule applies to "defamatory forms of mass communication or aggregate publication." Eramo v. Rolling Stone, LLC, 209 F. Supp. 3d 862,

---

[16] The defendants do not discuss every article, video, tweet, and other statement referenced in the complaint in their briefing. This is perhaps unsurprising, given that the complaint incorporates by reference over 150 hyperlinks, some of which are relevant to Lokhova's allegations against the defendants and some of which are not.

[17] As an initial matter, many of the cited electronic references also occurred outside the statute of limitations and are themselves time-barred. The complaint identifies no timely electronic references whatsoever to the statements on the Rachel Maddow Show, the 11th Hour with Brian Williams, or the May 2017 MSNBC program. Therefore, there is no question that defamation claims based on those statements are time-barred.

879 (W.D. Va. 2016), reconsideration granted on other grounds, No. 3:15-cv-23, 2016 WL

5942328 (W.D. Va. Oct. 11, 2016). Under the rule, a single publication includes "[a]ny one

edition of a book or a newspaper." Doe v. Roe, 295 F. Supp. 3d 664, 670 (E.D. Va. 2018)

(internal quotation marks and citation omitted). "Jurisdictions that have adopted the single

publication rule are nearly unanimous in applying it to internet publications," Eramo, 209 F.

Supp. 3d at 879 (internal quotation marks and citations omitted), and a court in this district has

suggested that the rule "applies . . . to . . . the distribution of newspapers [and]. . . internet posts .

. . ." Doe, 295 F. Supp. 3d at 671 n.8. The rule was designed "to avoid the overwhelming

multiplicity of lawsuits that could result from defamatory statements contained in mass

publications such as newspapers and magazines." Armstrong v. Bank of Am., 61 Va. Cir. 131, at

*2 (2003). Although the Virginia Supreme Court does not appear to have formally addressed this

issue, the Fourth Circuit has determined that Virginia would follow "[t]he great majority of states

[that] now follow the single publication rule." See Morrissey, 739 F.2d at 967 (4th Cir. 1984)

(internal quotation marks and citations omitted); Semida v. Rice, 863 F.2d 1156, 1161 n.2 (4th

Cir. 1988); see also Phillips v. Loudoun Cty. Pub. Sch., No. 1:19-cv-501, 2019 WL 5445292, at

*8 (E.D. Va. Oct. 23, 2019). Because this civil action involves publications by major media

organizations about matters of public concern, the application of the single publication rule has

significant First Amendment implications.

b.  The republication doctrine

Despite the single publication rule, Lokhova argues that the post-May 22, 2018 electronic

references to otherwise time-barred articles bring those earlier publications within the statute of

limitations under the republication doctrine, which provides that "where the same defamer

communicates a defamatory statement on several different occasions to the same or different

audience, each of those statements constitutes a separate publication" triggering a new the statute

of limitations. Doe, 295 F. Supp. 3d at 670–71; see also WJLA-TV v. Levin, 264 Va. 140, 153

(2002). Some courts have described this doctrine as an exception to the single publication rule.

Eramo, 209 F. Supp. 3d at 879. Republication includes instances where the publisher has

"affirmatively reiterated" the statement. Id. (quoting Clark v. Viacom Int'l Inc., 617 Fed. App'x.

495, 505 (6th Cir. 2015)). Although it is "less clear how the republication exception to the single

publication rule applies in the context of electronic media," Eramo, 209 F. Supp. 3d at 879,

courts outside Virginia have held that "a statement on a website is not republished unless the

statement itself is substantively altered or added to, or the website is directed to a new audience."

Id. (quoting Yeager v. Bowlin, 693 F.3d 1076, 1082 (9th Cir. 2012)). For the reasons discussed

below, Lokhova's argument that the republication doctrine should apply fails.

> i.   Defendants' alleged republication

The republication exception typically applies to republication by the defendant itself.

Here, the only timely alleged republication by a defendant of an otherwise time-barred article

was the online version of the April 9, 2019 New York Times article (Attachment A), which

referenced and included a hyperlink to its May 18, 2018 article. Am. Compl. ¶ 5. Lokhova does

not contend that the April 9, 2019 article was itself defamatory; instead, she appears to be

arguing that because the article contains a link to the May 18, 2018 article, it constitutes a

republication of that earlier article, which Lokhova does allege was defamatory. The 1,357-word

May 18, 2018 article, in turn, briefly mentions Flynn's "apparent closeness with a Russian

woman" in attendance at the February 2014 event, and states that concerns about this closeness

"prompted another person to pass on a warning to the American authorities that Mr. Flynn could

be compromised by Russian intelligence." Id. ¶ 158. The May 2018 article also states that in late

2016, a "number of [the Seminar's] organizers resigned over what they said was a Kremlin-backed attempt to take control of the group." Id. Even if these May 2018 statements were themselves defamatory of Lokhova, which is extremely dubious, they were published more than a year before Lokhova's complaint was filed. The April 9, 2019 article does nothing to bring these statements within the statute of limitations period.

As persuasive case law from other circuits suggests, although "creating hypertext links to previously published statements" may technically direct audiences' attention to the prior dissemination of those statements, such links do not constitute republication. Clark, 617 F. App'x at 505-507 ("Nor does the republication doctrine apply where audience attention is directed toward the allegedly defamatory statements' preexisting dissemination . . . . Thus, run-of-the-mill hyperlinks . . . typically demonstrate neither the intent nor the ability to garner a wider audience than the initial iteration of the online statement could reach."); In re Philadelphia Newspapers, 690 F.3d 161, 174–75 (3d Cir. 2012), as corrected (Oct. 25, 2012) (collecting cases) ("Several courts specifically have considered whether linking to previously published material is republication. To date, they all hold that it is not based on a determination that a link is akin to the release of an additional copy of the same edition of a publication because it does not alter the substance of the original publication."). There is good reason for this rule. As the Third Circuit has observed,

> [w]ebsites are constantly linked . . . . If each link . . . were an act of republication, the statute of limitations would be retriggered endlessly and its effectiveness essentially eliminated. A publisher would remain subject to suit for statements made many years prior, and ultimately could be sued repeatedly for a single tortious act the prohibition of which was the genesis of the single publication rule.

In re Philadelphia Newspapers, LLC, 690 F.3d at 175. Therefore, the New York Times' 2019 hyperlink is insufficient to retrigger the statute of limitations.

Lokhova nevertheless argues that there is a factual question whether the alleged republication included additional content beyond a hyperlink that would constitute republication, and that the Court must therefore deny the motion to dismiss at this stage of the litigation. Although this argument might be meritorious in other contexts, it fails here. The New York Times' April 9, 2019 article, titled "Justice Dept. Watchdog's Review of Russia Inquiry Is Nearly Done, Barr Says," does not mention or concern Lokhova; instead it focuses on the Inspector General's investigation "into aspects of the Russia inquiry, including whether law enforcement officials abused their powers in surveilling a former Trump campaign aide." See Am. Compl. ¶ 5 (linking to https://www.nytimes.com/2019/04/09/us/politics/russia-investigation-barr.html). The article's discussion of Halper includes a sentence containing a hyperlink to the May 18, 2018 article. Id. The underlined portion of the following sentence contains the hyperlink: "Mr. Halper's contacts have prompted Republicans and the president to incorrectly accuse the F.B.I. of spying on the campaign." Id. This statement does not substantively alter or add to the portion of the May 18, 2018 article that allegedly defamed Lokhova. "[U]nder traditional principles of republication, a mere reference to an article, regardless how favorable it is as long as it does not restate the defamatory material, does not republish the material." In re Philadelphia Newspapers, LLC, 690 F.3d at 175. This is because "[w]hile [a reference] may call the existence of the article to the attention of a new audience, it does not present the defamatory contents of the article to the audience." Salyer v. Southern Poverty Law Center, Inc., 701 F.Supp.2d 912, 916 (W.D. Ky. 2009) (emphasis in original). Under this persuasive case law, the New York Times' 2019 article does not retrigger the statute of limitations for the May 18, 2018 article.

20

Further, none of the case law cited by Lokhova supports reaching a different conclusion.[18] Some of the cases Lokhova cites discuss the republication issue only in passing or in a different context and are therefore of limited utility. See, e.g., Gilmore v. Jones, 370 F. Supp. 3d 630, 658 n.30, 677 n.50 (W.D. Va. 2019), motion to certify appeal granted, No. 3:18-cv-17, 2019 WL 4417490 (W.D. Va. Sept. 16, 2019) (finding that an alleged republication was sufficient to enable the court to exercise specific personal jurisdiction over a defendant and to state a claim for defamation, but not addressing the question of whether an alleged republication restarts the statute of limitations). Most of the cited cases in which courts have found that a defendant's later statement could constitute a republication are readily distinguishable, and Lokhova's reliance on them is therefore misplaced. In Eramo, for example, a court found at the motion for summary judgment stage that there was a genuine dispute of material fact as to whether an Editor's Note appended to an allegedly defamatory article constituted a republication, and that the question therefore needed to be submitted to a jury. In sharp contrast to the New York Times' passing reference to a general conclusion in the original article, the entire Editor's Note in Eramo focused on the content of the original allegedly defamatory article, and the Note restated allegedly defamatory statements from the original article at length. No. 3:15-cv-23, [Dkt. No. 1-1] at 81-84. Similarly, in Doe and Enigma Software Grp. USA, LLC v. Bleeping Computer LLC, the courts concluded that where a defendant had made multiple different allegedly defamatory statements, each statement could constitute a republication. 295 F. Supp. 3d 664, 673 (E.D. Va. 2018); 194 F. Supp. 3d 263, 277 (S.D.N.Y. 2016). And in League of United Latin Am. Citizens - Richmond Region Council 4614 v. Pub. Interest Legal Found., No.

---

[18] Although Lokhova has cited a large number of cases, only those that are most relevant need be addressed.

1:18-cv-423, 2018 WL 3848404, at *1, 7 (E.D. Va. Aug. 13, 2018), the court found that a document the defendants issued as a "sequel" to an allegedly defamatory original document was a republication, where the sequel document repeated the allegedly defamatory statements. In those cases, unlike this one, the defendants' subsequent statements themselves included allegedly defamatory content, and were not mere references to portions of their initial statement that had nothing to do with the plaintiff. For these reasons, the April 2019 New York Times article did not restart the statute of limitations for its May 18, 2018 article.

        ii.   Third-party republication of the media defendants' statements

    Lokhova's argument does not stop there. She asserts that the media defendants are not only liable for their own republications, but also for third parties' electronic references to their allegedly defamatory statements. Lokhova cites to third-party tweets posted on or after May 23, 2018 that link to and discuss the media defendants' allegedly defamatory articles. See, e.g., Am. Compl. ¶ 112 (citing tweets commenting on and linking to the 2017 Journal article); ¶ 163 (citing tweets commenting on and linking to the 2017 Journal article and the 2018 New York Times article); ¶ 172 (citing tweets published by Costa and the Post, which third parties have commented on); ¶¶ 178 and 179 (linking to the 2018 Nance tweets, which other Twitter users have subsequently commented on and retweeted).

    This argument is similarly unpersuasive. Lokhova has not cited any case holding that a media organization is liable in perpetuity for third-party tweets of its allegedly defamatory materials. Indeed, Lokhova's argument is inconsistent with persuasive case law from other courts, which "have concluded that statements posted to a generally accessible website are not republished by" "a third party's posting the statement elsewhere on the internet." Clark, 617 F. App'x at 505 (citing Jankovic v. Int'l Crisis Grp., 494 F.3d 1080, 1087 (D.C. Cir. 2007) ("In the

print media world, the copying of an article by a reader—even for wide distribution—does not constitute a new publication. See Restatement § 577A cmt. d & illus. 6. The equivalent occurrence should be treated no differently on the Internet.")). This rule is sensible; if a defendant's own hyperlink or reference to the alleged defamatory material does not constitute republication that creates additional liability for the defendant, it would be bizarre to conclude that an unrelated third party's independent hyperlink, tweet, or other electronic reference does so.

Further, even to the extent the third-party electronic references include new comments on the allegedly defamatory materials, those comments do not constitute republication for which the original publisher can be held liable. "[T]he ability of third parties to comment on articles is a unique advantage of the internet, and thus application of the republication concept" to third-party comments would be inappropriate. See Biro v. Conde Nast, 963 F. Supp. 2d 255, 268 (S.D.N.Y. 2013), aff'd, 807 F.3d 541 (2d Cir. 2015), and aff'd, 622 F. App'x 67 (2d Cir. 2015). In fact, the availability of forums like Twitter can sometimes enable people who believe they have been defamed to be able to debunk the statements they believe are defamatory. See David S. Ardia, "Reputation in a Networked World: Revisiting the Social Foundations of Defamation Law," 45 Harv. C.R.C.L. L. Rev. 261, 318 (Summer 2010) ("On the Internet, those who believe they have been defamed can quickly add their side of the story to the comments section or, perhaps, be accorded the ability to have a link to their own Web site included with the original statement or added to search results."). Indeed, Lokhova herself has used Twitter to dispute some of the allegations in defendants' articles. See Am. Compl. ¶ 112 (linking to https://twitter.com/search?q=https%3A%2F%2Fwww.wsj.com%2Farticles%2Fmike-flynn-didnt-report-2014-interaction-with-russian-british-national-1489809842&src=typd, which includes a tweet thread issued by Lokhova stating, in part: "I woke up on the morning of March

18, 2017 to read a story full of errors, innuendo, 'anonymous sources', 'former senior officials',
etc. All the hallmarks of a hit on @GenFlynn.").

In support of her republication argument, Lokhova relies on <u>Weaver v. Beneficial</u>
<u>Finance Co.</u>, 199 Va. 196 (1957), a Virginia Supreme Court decision issued over 60 years ago,
well before the advent of the internet and Twitter. <u>Weaver</u> did not involve publication by a media
defendant. Instead, it involved an allegedly defamatory letter sent by the defendants to the
plaintiff's employer stating that the plaintiff owed the defendants money and effectively asking
for the employer's assistance in ensuring that the debt be paid. <u>Id.</u> at 197-98. Although any claim
based on the original publication of the letter was time-barred, the letter was subsequently
republished before a promotion board convened to consider the plaintiff's record. In that context,
the court observed that "the author or originator of a defamation is liable for a republication or
repetition thereof by third persons, provided it is the natural and probable consequence of his act,
or he has presumptively or actually authorized or directed its republication." <u>Id.</u> at 199. The court
determined that "[t]he jury could conclude from [defendants'] statement [in the letter] that [they]
were requesting that the letter be republished to [plaintiff's] superiors at a future date or that the
republication was the natural and probable consequence of their act," which would retrigger the
statute of limitations. <u>Id.</u> at 201. The <u>Weaver</u> court quoted a secondary source stating that "where
the words declared on are slanderous per se their repetition by others is the natural and probable
result of the original slander," <u>id.</u> at 200 (quoting Newell, Slander and Libel (4th Ed.) § 303);
however, the court made clear that "the original author is not responsible if the republication or
repetition is not the natural and probable consequence of his act, but is the independent and
unauthorized act of a third party," <u>id.</u> at 199. Lokhova argues that republication by third parties
was the natural and probable result of defendants' statements, because those statements were

24

defamatory per se, and defendants "knew or should have known that their defamatory statements would be republished over and over by third-parties to Lokhova's detriment." Am. Compl. ¶¶ 186, 187.

Contrary to Lokhova's assertions, Weaver does not support her position, and in fact undermines it by recognizing special rules "applicable to newspapers and magazines,"[19] as articulated in Hartmann v. Time, Inc., 166 F.2d 127 (3d Cir. 1947). In Hartmann, the Third Circuit observed that the single publication rule

> is the preferable one and is recommended both by logic and by public policy. Public policy must regard the freedom of the press and while the law must exact penalties for libel the instruments of free and effective expression, newspapers and magazines which are published on a nationwide basis, should not be subjected to the harassment of repeated law suits.

Id. at 134. The Weaver court also quoted a secondary source stating that "the publisher of a newspaper or magazine has been held not responsible for the acts of third persons who, after the original publication, sell copies of the newspaper or magazine to others." Weaver, 199 Va. at 200 (quoting 53 C.J.S., Libel and Slander, § 85, p. 137). The principles underlying this rule are doubly important in the age of the internet, because holding the media defendants liable for subsequent third-party distribution via Twitter or other forms of electronic distribution "would implicate an even greater potential for endless retriggering of the statute of limitations, multiplicity of suits and harassment of defendants," which would create "a serious inhibitory effect on the open, pervasive dissemination of information and ideas over the [i]nternet, which is, of course, its greatest beneficial promise." Firth v. State, 98 N.Y.2d 365, 370 (2002).

---

[19] See Weaver, 199 Va. at 200 ("[F]or a discussion of the rules applicable to newspapers and magazines see Hartmann v. Time.").

25

Lokhova cites cases confirming that republication by third parties may under some circumstances trigger a new cause of action; however, she has cited no case holding that it is appropriate to hold media defendants liable in perpetuity for third-party tweets of their publications. In fact, some of the cited cases support the proposition that subsequent independent and unauthorized publication by unrelated third parties does not create liability for the original publisher. For example, in Doe, the court held that an individual's own publication of multiple different allegedly defamatory statements retriggered the statute of limitations, but observed that the "result might well have been different" if, as here, the defendant's original statement had subsequently "been distributed to various individuals . . . without [defendant] affirmatively republishing [the] story." 295 F. Supp. 3d at 672. Likewise, in Dragulescu v. Virginia Union Univ., 223 F. Supp. 3d 499, 509 (E.D. Va. 2016), the court observed that under the republication doctrine, "each successive publication of an old or preexisting defamatory statement gives rise to a new cause of action," id., but confirmed that when the single publication rule applies, "subsequent viewings of one allegedly defamatory document do not constitute successive publications." Id. at 512. The court in Dragulescu also held that a defendant was not liable for rumors circulated among third parties about the plaintiff, because those rumors could not be "attributed" to defendant. Id. at 512. Similarly here, defendants are not liable for third-party tweets and other postings because those statements cannot be attributed to them.

Some of the case law cited by Lokhova's counsel suggests that third-party re-publishers themselves ought to be liable when they adopt a defamatory statement as their own, and that may be appropriate in some instances. See, e.g., Reuber v. Food Chem. News, Inc., 925 F.2d 703, 712 (4th Cir. 1991) ("Under the republication rule, one who repeats a defamatory statement is as liable as the original defamer.") (internal quotation marks and citations omitted). But Lokhova

has not sued any third-party re-publishers here. Instead, she seeks to hold the original mass

media publishers liable for third-parties reposting and commenting on their articles. Adopting

Lokhova's argument with respect to the media defendants, in the age of the internet, would

violate the single publication rule, render the statute of limitations meaningless, and undermine

First Amendment protections of the press. For these reasons, it is rejected by the Court.

### iii.   Third-party republication of Halper's statements

For similar reasons, the Court finds that the alleged third-party republication of

statements allegedly made by Halper did not retrigger the statute of limitations for those

statements. In addition to the electronic references to the media defendants' articles discussed

above, the complaint also mentions various electronic references to articles published by non-

defendant media outlets, for which the complaint alleges Halper was the original source. See,

e.g., Am. Compl. ¶ 87 (citing tweets commenting on and linking to the 2016 Financial Times

article); ¶ 98 (citing tweets including the phrase "General Misha"); ¶ 99 (citing tweets

commenting on and linking to the 2017 Sunday Times of London article); ¶ 122 (citing a

September 17, 2018 article in the Atlantic and tweets commenting on and linking to the 2017

Guardian article); ¶ 128 (citing tweets commenting on and linking to the 2017 Telegraph article).

The link between Halper and these subsequent electronic references is even more attenuated than

it is for the media defendants. To survive a motion to dismiss, Lokhova must sufficiently allege

facts, not conclusions, which adequately identify Halper as the source of the allegedly

defamatory statements given to the various media outlets in the first place, as well as establish

that Halper is somehow responsible in perpetuity for independent third parties subsequently

tweeting or writing about the articles in which his alleged statements appeared. Halper

persuasively argues that Lokhova has not even established the first link in this chain, because she

has not provided sufficient information about his alleged defamatory statements to the various media outlets to satisfy Rule 8. See Scott v. Carlson, No. 2:18-cv-47, 2018 WL 6537145, at *3 (W.D. Va. Dec. 2, 2018) ("Federal pleading standards require that a plaintiff specifically allege each act of defamation."). As to the link between the allegedly defamatory articles and the third-party republications, the arguments about the dangers of a multiple publication rule in the context of the internet apply not only to the media defendants, but also to individuals who are alleged to have been the source for articles published by the media. Protecting media defendants from never-ending liability for third-party electronic republications would mean little if the protection did not also extend to their sources.

The parties' briefing references cases in which courts have held sources of information liable for subsequent republication of their information, see, e.g., Blue Ridge Bank v. Veribanc, Inc., 866 F.2d 681 (4th Cir. 1989); Moore v. Allied Chemical Corp, 480 F. Supp. 364 (E.D. Va. 1979). These cases are of limited value as they were decided more than 30 years ago, before the ubiquity of the internet, and their discussion of the republication issue is sparse. In Moore, for example, the court held that the statute of limitations for a defamation claim could be retriggered upon the republication by third-party media outlets of the defendant's otherwise time-barred statements about the plaintiff's involvement in a chemical disaster. Even in the era when Moore was issued, its approach was "far from universally accepted." Foretich v. Glamour, 741 F. Supp. 247, 253 n.9 (D.D.C. 1990) (collecting cases). Moreover, because of the age of the decision, the Moore court did not consider the nature of the internet in developing its theory of liability.

Blue Ridge is easily distinguishable. In that case, the defendant, a financial reporting service, created a report containing inaccurate information about the plaintiff bank, and sent that report upon request to a newspaper columnist. In exchange for providing the report, the

28

defendant reporting service "expected to be cited as the source of the information." 866 F.2d at

683. The court therefore held that the defendant could not credibly argue that the subsequent

publication of information from the report by the newspapers carrying the journalist's column

was an "improbable or unnatural result" of its actions under Weaver. Id. at 690. Blue Ridge's

holding is uncontroversial. It stands for the principle that when a source intentionally provides

defamatory information to a media professional with the expectation of being cited as a source of

the information, that source cannot later escape liability by claiming that the publication of that

information was not a natural or probable consequence. Blue Ridge does not stand for the

proposition that unnamed sources who provide information to media outlets are liable in

perpetuity for any subsequent discussions of that information by third parties, let alone liable for

all later online chatter stemming from that information. For these reasons, Halper, like the media

defendants, is not liable for the third-party electronic references alleged in the complaint.

Accordingly, all of Lokhova's defamation claims, but for those arising out of statements made by

defendants themselves on or after May 23, 2018, are time-barred.

    2.  The timely publications[20]

---

[20] In addressing Lokhova's timely claims, there is a threshold question of whether Virginia, New York, or District of Columbia provides the applicable law. Determining which law should apply to substantive issues in a multi-jurisdiction, multi-defendant lawsuit involving internet publications can be somewhat complex, but as a practical matter, the choice of law issue is of little consequence, because the laws of all three jurisdictions support the same result: dismissal of Lokhova's claims. Because Lokhova's claims may be dismissed on grounds common to all three jurisdictions, the applicability of state-specific statutes like the Virginia anti-SLAPP statute, Va. Code § 8.01-223.2, need not be resolved, and the Court will not award attorneys' fees under that statute. In addition, to the extent Lokhova's claims implicate constitutional rights, federal law applies, see AESP, Inc. v. Signamax, LLC, 29 F. Supp. 3d 683, 687 (E.D. Va. 2014), which also supports dismissal. See also Yeagle v. Collegiate Times, 255 Va. 293, 295 (1998) ("Causes of action for defamation have their basis in state common law but are subject to principles of freedom of speech arising under the First Amendment to the United States Constitution . . . .").

The only two allegedly defamatory written materials not time-barred are the June 5, 2018 Post article and the July 2018 tweets issued by Nance.[21] To state a claim for defamation, a plaintiff must plead, among other things, the publication of an actionable statement. Va. Citizens Defense League v. Courie, 910 F.3d 780, 783 (4th Cir. 2018).[22] "A pleading for defamation must [also] allege or otherwise make apparent on the face of the pleading that the alleged defamatory statements are 'of and concerning' the plaintiff." Schaecher v. Bouffault, 290 Va. 83, 99 (2015) (internal citation omitted). Statements that do not facially refer to the plaintiff may nonetheless be "of and concerning" the plaintiff "if the allegations and supporting contemporaneous facts connect the libelous words to the plaintiff, if those who know or know of the plaintiff would

---

[21] The complaint also mentions two apparently verbal statements that occurred within the relevant period. It is unclear whether plaintiff contends that these statements constitute defamatory publications for which defendants are liable, or whether they are simply mentioned as background information. To the extent plaintiff intends to argue the former, that argument fails, because neither of these alleged statements can support a defamation claim. First, the complaint alleges that sometime after May 2018, Lokhova heard from an NBCUniversal producer that her "colleague at NBCUniversal" ("the colleague") with "25 years intelligence experience" said that "everyone at the CIA knows Flynn had an affair with Lokhova." Am. Compl. ¶ 177. The complaint does not allege that NBCUniversal is liable for this alleged statement through a theory of respondeat superior, nor does it directly claim that the colleague was an NBCUniversal employee or was acting within the scope of employment when making the statement, or that Halper was the source of the colleague's information. It therefore does not adequately link this alleged statement to any of the defendants. Second, the complaint alleges that on an unspecified date, Halper told a chief reporter with the Sunday Times of London that Lokhova was a Russian spy. Am. Compl. ¶ 89. The placement of this allegation within the complaint's chronology suggests Lokhova is alleging that this statement occurred in December 2016, which would make it time-barred. The complaint then alleges that on December 19, 2019, the reporter "called Lokhova and repeated the false allegation." This allegation is obviously erroneous, because December 19, 2019 had not yet occurred when the complaint was filed. Even if this phone call took place within the statute of limitations, it would not constitute defamation, because the complaint does not allege that the call involved anyone besides the reporter and Lokhova. See Weaver, 199 Va. at 203 (observing that a defamatory statement is published when it "is read by or otherwise communicated to someone other than the person defamed") (emphasis added).

[22] The requirements are similar under District of Columbia and New York law. See e.g., Chau v. Lewis, 771 F.3d 118, 126-27 (2d Cir. 2014); Weyrich v. New Republic, Inc., 235 F.3d 617, 627 (D.C. Cir. 2001).

believe that the [statement] was intended to refer to him, or if the statement contains a description or reference to him." Quill Ink Books, Ltd. v. Soto, No. 1:19-cv-476, 2019 WL 5580222, at *2 (E.D. Va. Oct. 29, 2019) (internal quotation marks and citations omitted).

"Whether a statement is actionable is a matter of law to be determined by the court." Chapin v. Knight-Ridder, Inc., 993 F.2d 1087, 1092 (4th Cir. 1993). "To be actionable, the statement must be both false and defamatory." Jordan v. Kollman, 269 Va. 569, 575 (2005). At the 12(b)(6) stage, the Court "must accept as false any statements which the Complaint alleges to be false," Goulmamine v. CVS Pharmacy, Inc., 138 F. Supp. 3d 652, 659, "unless the allegation of falsity is vague and conclusory or contradicts an external document incorporated into the complaint." Edwards, 378 F. Supp. 3d at 522 (citation omitted). Therefore, "the key actionability question in deciding a motion to dismiss is whether the statements referenced in the Complaint are defamatory," Goulmamine, 138 F. Supp. 3d at 659, or "tend[] so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." Chapin, 993 F.2d at 1092 (internal quotation marks and citations omitted). Defamatory words include those that "make the plaintiff appear odious, infamous, or ridiculous." Id. (quoting McBride v. Merrell Dow and Pharmaceuticals, Inc., 540 F. Supp. 1252, 1254 (D.D.C. 1982), rev'd in part on other grounds, 717 F.2d 1460 (D.C. Cir. 1983)). Although a plaintiff may allege defamation based on implication or innuendo arising out of statements that are otherwise non-actionable on their face, those statements must "be reasonably read to impart the false innuendo." Chapin, 993 F.2d at 1093.

a.   The June 5, 2018 Post Article

The complaint identifies only two statements in the entire 2,262-word Post article (Attachment B) that are allegedly false and defamatory of Lokhova: (1) that Halper "attended"

31

the February 2014 dinner, and (2) that "Halper and Dearlove were disconcerted by the attention

the then- DIA chief showed to a Russian-born graduate student who regularly attended the

seminars, according to people familiar with the episode." Am. Compl. ¶ 171, [Dkt. No. 74] at 8.

Even assuming the first statement to be false, the statement does not defame anyone, and clearly

is not "of and concerning" Lokhova; it relates to Halper alone. The second statement does not

name Lokhova and simply includes a generic reference to a "Russian-born graduate student who

regularly attended the seminars."[23] Even assuming that the statement is "of and concerning"

Lokhova and is false, it does not defame her. At most, the second statement suggests there were

concerns about Flynn's behavior towards Lokhova, without stating or implying that Lokhova

herself did anything improper. The same conclusion applies when the two statements are

considered together, and in the context of the other statements in the article as a whole,

particularly because the sentence immediately following the second quote provides a clear

disclaimer of any wrongdoing: "the student and a Defense Department official traveling with

Flynn have denied that anything inappropriate occurred." Am. Compl. ¶ 170. In short, there is

nothing in this article that defames the plaintiff.

This conclusion is supported by recent case law. In Deripaska v. Associated Press, 282 F.

Supp. 3d 133 (D.D.C. 2017), the plaintiff was a Russian businessman who allegedly had

interactions with President Trump's former campaign manager Paul Manafort. He argued that

---

[23] Some of the other allegedly defamatory articles referenced in the complaint include Lokhova's name, and a reader reviewing all of these articles together could conclude that the Post article intended to refer to Lokhova. The Virginia Supreme Court has held that "statements or publications by the same defendant regarding one specific subject or event and made over a relatively short period of time, some of which clearly identify the plaintiff and others which do not, may be considered together for the purpose of establishing that the plaintiff was the person 'of or concerning' whom the alleged defamatory statements were made." WJLA-TV, 264 Va. at 153 (emphasis added). This conclusion does not hold where, as here, the publications clearly identifying Lokhova were not published by the Post.

the Associated Press defamed him in an article by, among other things, suggesting that Manafort illegally lobbied on Deripaska's behalf. The court rejected this argument, explaining that "[d]efamation is personal," and pointing out that if the article "implies that anyone broke the law, the subject of that implication is limited to Manafort only." Id. at 145 (internal quotation marks and citations omitted). Similarly, in Webb v. Virginian-Pilot Media Companies, LLC, 287 Va. 84 (2014), the plaintiff, an assistant school principal, sued a newspaper for publishing a statement allegedly insinuating that he "had engaged in unethical conduct by obtaining preferential treatment for his son." Id. at 87 (internal quotation marks omitted). The Supreme Court of Virginia concluded that although the article "insinuates that [the plaintiff's son] may have benefited from special treatment," "[it] does not create a reasonable implication that [the plaintiff] solicited or procured the insinuated special treatment." Id. at 90. Here too, the Post article could be read to insinuate that a non-party, Flynn, who was a public figure holding a very sensitive position, behaved inappropriately towards Lokhova. Lokhova has not alleged how a statement that clearly focuses on Flynn behaving inappropriately harms her own reputation or makes her appear "odious, infamous, or ridiculous." Chapin, 993 F.2d at 1092. As Lokhova herself has acknowledged, at most she is "collateral damage" of the "scandal" surrounding Halper and Flynn. [Dkt. No. 75] at 8.

Nor can the statements in the article, considered either separately or in the context of the article as a whole, be read to imply that Lokhova was a "Russian spy" or a "traitor to her country," that she "had an affair with General Flynn on the orders of Russian intelligence" or "compromised General Flynn." Am. Compl. ¶ 4, or that the Post was "privy to facts about" Lokhova "that are unknown to the general" reader. Steele, 382 F. Supp. 3d at 419 (internal quotation marks and citations omitted). The article focuses on Halper's activity, and includes the

33

allegations about Flynn's behavior at the 2014 event as one of a series of stories about Halper's time at Cambridge. The only brief portions of the lengthy article that even remotely relate to Lokhova are those discussed above. Reading the article as Lokhova suggests would "stretch" it "well beyond its ordinary and common meaning . . . . Although we must construe inferences and innuendo in [plaintiff's] favor, we may not introduce new matter, nor extend the meaning of the words used, or make that certain which is in fact uncertain." Virginia Citizens Def. League, 910 F.3d at 785 (internal quotation marks and citations omitted). Even when reviewing the article in the light most favorable to the plaintiff, it cannot reasonably be construed to include innuendo that is simply not there. For these reasons, the Post article does not defame plaintiff.

b.  The July 2018 Nance tweets

Lokhova has not yet served defendant Nance with her complaint, and he has not appeared. Therefore, his tweets are relevant only to the extent Lokhova has adequately pleaded NBCUniversal's liability for these tweets through the doctrine of respondeat superior. She has failed to plead sufficient facts to support such liability.

Most of the support for Lokhova's allegation that NBCUniversal is vicariously liable for Nance's tweets comes in the form of conclusory assertions. The complaint asserts that "[a]t all times relevant to this action, NBCUniversal/MSNBC acted by and through its authorized agents, including" Nance, and that "NBCUniversal is liable for Nance's false and defamatory tweets under the doctrine of respondeat superior." Am. Compl. ¶ 173. Legal conclusions like these are "insufficient to state a claim for relief that is plausible on its face." Victoria Select Ins. Co. v. R&G Transportation, No. 3:16-cv-624, 2017 WL 5158684, at *4 (E.D. Va. Sept. 7, 2017); Twombly, 550 U.S. at 555 ("[O]n a motion to dismiss, courts are not bound to accept as true a

legal conclusion couched as a factual allegation.") (internal quotation marks and citations omitted).

The complaint adds that Nance "is 'the chief terrorism analyst on MCNBC,'" [sic] and a "regular contributor to the business of MSNBC, appearing in hundreds of videos over many years," who "maintains and operates an official Twitter account on which he conducts the business of 'NBC/MSNBC.'" Am. Compl. ¶ 173 (citing Nance's biography on Twitter, which states: "US Intelligence +36 yrs. Expert Terrorist Strategy,Tactics,Ideology. [sic] Torture, Russian Cyber! NYT Bestselling Author, Navy Senior Chief/Jedi Master, NBC/MSNBC."). The complaint appears to presume that because Nance is associated with NBCUniversal in some capacity, listed "NBC/MSNBC" as the last of many identifiers in his biography, and issued the allegedly defamatory tweets "during normal business hours," his tweets were necessarily issued "while performing the business of MSNBC," for which NBCUniversal must be liable. Id.

The Virginia Supreme Court has held that a rebuttable presumption of vicarious liability may be created when a complaint contends that an employer-employee relationship exists, see, e.g., Parker v. Carilion Clinic, 296 Va. 319, 341-42 (2018); however, plaintiff's complaint does not specifically allege that Nance was an NBCUniversal employee.[24] Instead, it suggests that Nance "holds himself as an agent of MSNBC." Id. ¶ 19. To the extent Lokhova is attempting to allege that NBCUniversal is liable for Nance's tweets through a theory of apparent agency, this claim fails under Virginia law, which Lokhova argues should apply, because although Virginia courts have applied the theory of apparent agency to contract cases, it appears that the theory

---

[24] Although plaintiff refers to Nance as an MSNBC employee in her opposition to the media defendants' motions to dismiss, [Dkt. No. 75] at 12, "[i]t is well-established that parties cannot amend their complaints through briefing or oral advocacy." S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC, 713 F.3d 175, 184 (4th Cir. 2013).

"has never been used in Virginia to impose vicarious liability on an employer for the negligent acts of an independent contractor." Parrish v. Am. Airlines, Inc., 97 Va. Cir. 271, at *4 (2017) (internal quotation marks and citation omitted). Moreover, regardless of which law applies and whether Nance is an NBCUniversal employee or agent, relying on the respondeat superior doctrine to hold NBCUniversal liable for every tweet issued by one of its employees or agents during business hours, without requiring more specific allegations from the plaintiff, would lead to undesirable consequences. See Garnett v. Remedi Seniorcare of Virginia, LLC, 892 F.3d 140, 144 (4th Cir.), cert. denied, 139 S. Ct. 605 (2018) ("It is difficult to see how employers could prevent all offensive or defamatory speech at the proverbial watercooler without transforming the workplace into a virtual panopticon. For all its undoubted value, respondeat superior and the resultant fear of liability should not propel a company deep into the lives of its workers whose . . . speech interests deserve respect."). The complaint lacks any non-conclusory allegations that Nance's tweets promoted NBCUniversal's interests, and in fact, one of the allegedly defamatory tweets appears in a string of tweets that began with a tweet promoting Nance's personal book.[25] Because Lokhova has not adequately pleaded that NBCUniversal may be held vicariously liable for Nance's tweets, her claim against NBCUniversal based on those tweets will be dismissed.

    3.   The tortious interference claim (Count III)[26]

_____

[25] The July 16, 2018 string of tweets began with the following tweet: "NRA-Russia liaison agent Maria Butina arrested. I wrote half a chapter about her in @Plot2Destroy moving fm Siberian furniture salesgirl to Russian 'gun rights@ director in America overnight. #SpyHard." Am. Compl. ¶ 178 (linking to https://twitter.com/MalcolmNance/status/1018954261391118338). The reference "@Plot2Destroy" appears to refer to a book written by Nance.

[26] Some of the media defendants argue that the Court should find that Lokhova abandoned her tortious interference claim by failing to respond to their arguments with respect to that claim. Despite the merit of the media defendants' abandonment argument, the merits of the tortious interference claim will be addressed.

Lokhova's tortious interference claim is effectively duplicative of her defamation claim.

See Edwards, 378 F. Supp. 3d at 538 (after dismissing defamation claims, finding that the

plaintiff's claims for common law civil conspiracy, statutory civil conspiracy, and tortious

interference with contract expectancy, business relationship, and economic advantage must also

be dismissed because those claims were "inextricably tied to [plaintiff's] underlying defamation

claims"). In addition, the claim is inadequately pleaded. For example, one key component of a

tortious interference claim, whether applying the law of Virginia, the District of Columbia, or

New York,[27] is the defendant's knowledge of the plaintiff's contractual or business relationship

or expectancy. Apart from vague and conclusory language, the complaint has failed to allege

facts indicating that any defendant, particularly any media defendant, was aware of any specific

---

[27] See, e.g., Schaecher, 290 Va. at 106 ("In Virginia, the elements of a claim for tortious interference with contractual relations are typically recited as (1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interferor; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted."); Goulmamine, 138 F. Supp. 3d at 672 ("The elements of a claim for tortious interference with business expectancy are: (1) existence of a business relationship or expectancy with a probability of future economic benefit to plaintiff; (2) defendant's knowledge of the relationship or expectancy; (3) a reasonable certainty that plaintiff would have continued in the relationship or realized the expectancy absent defendant's intentional misconduct; (4) interference by improper methods; and (5) damages resulting from that interference."); Browning v. Clinton, 292 F.3d 235, 242 (D.C. Cir. 2002) ("To survive a motion to dismiss . . . [plaintiff] must plead (1) the existence of a valid business relationship or expectancy, (2) knowledge of the relationship or expectancy on the part of the interferer, (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy, and (4) resultant damage.") (internal quotation marks and citations omitted); Lama Holding Co. v. Smith Barney Inc., 88 N.Y.2d 413, 424 (1996) ("Tortious interference with contract requires the existence of a valid contract between the plaintiff and a third party, defendant's knowledge of that contract, defendant's intentional procurement of the third-party's breach of the contract without justification, actual breach of the contract, and damages resulting therefrom."); see also Kramer v. Pollock-Krasner Found., 890 F. Supp. 250, 258 (S.D.N.Y. 1995) ("A claim for interference with prospective contractual relations is very difficult to sustain. It must meet requirements more demanding than those for interference with [the] performance of an existing contract.") (internal quotation marks and citations omitted).

contracts or business expectancies Lokhova may have had, let alone that they wrongfully or intentionally interfered with any specific such relationships or that Lokhova lost specific business opportunities as a result of their actions. Moreover, one component of Lokhova's tortious interference claim is illogical. Although Lokhova seems to be claiming that defendants interfered with her book deals with Basic Books and Penguin, according to the complaint, those deals ended in 2016 before the alleged defamation, because Andrew "walked away." Am. Compl. ¶ 72. For these reasons, the tortious interference claim will be dismissed.

4. The common law conspiracy claim (Count II)

Lokhova's common law conspiracy claim also fails no matter which jurisdiction's law applies. Under Virginia law, a conspiracy claim "generally requires proof that the underlying tort was committed." Firestone v. Wiley, 485 F. Supp. 2d 694, 703 (E.D. Va. 2007) ("[W]here there is no actionable claim for the underlying alleged wrong, plaintiff cannot maintain a claim for civil conspiracy."). Moreover, in Virginia, "[t]he limitations period for a civil conspiracy is based on the statute of limitations for the underlying act." Hurst v. State Farm Mut. Auto. Ins. Co., No. 7:05-cv-776, 2007 WL 951692, at *5 (W.D. Va. Mar. 23, 2007), aff'd, 324 F. App'x 250 (4th Cir. 2009) (per curiam). Under New York law, courts do not recognize a "freestanding claim for conspiracy," Carlson v. Am. Int'l Grp., Inc., 30 N.Y.3d 288, 310 (2017), and "[a]llegations of conspiracy are permitted only to connect the actions of separate defendants with an otherwise actionable tort," Alexander & Alexander of New York, Inc. v. Fritzen, 68 N.Y.2d 968, 969 (1986). Similarly, under District of Columbia law, "[s]ince liability for civil conspiracy depends on performance of some underlying tortious act, the conspiracy is not independently actionable; rather, it is a means for establishing vicarious liability for the underlying tort." Halberstam v. Welch, 705 F.2d 472, 479 (D.C. Cir. 1983). Because the statements underlying

Lokhova's defamation claim are either time-barred, non-actionable, or unattributable to a served

defendant, and her tortious interference claim is duplicative of her defamation claim and

inadequately pleaded, neither tort can serve as the basis for a civil conspiracy claim against the

served defendants.

In addition, Lokhova has not adequately pleaded that the served defendants are liable for

other parties' publications through a theory of civil conspiracy, because her conspiracy

allegations are too conclusory to survive a motion to dismiss. See, e.g., Twombly, 550 U.S. at

556-57 (2007) (holding that in the Sherman Act context, "an allegation of parallel conduct and a

bare assertion of conspiracy will not suffice. Without more, parallel conduct does not suggest

conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply

facts adequate to show illegality"); Busby v. Capital One, N.A., 932 F. Supp. 2d 114, 141

(D.D.C. 2013) (stating that "conclusory allegations of an agreement do not suffice"); Firestone,

485 F. Supp. 2d at 703 (observing that "conclusory or general allegations of conspiracy . . . are

insufficient to withstand a motion to dismiss"); Am. Bldg. Maint. Co. of New York v. Acme

Prop. Servs., Inc., 515 F. Supp. 2d 298, 318 (N.D.N.Y. 2007) (stating that "more than a

conclusory allegation of conspiracy or common purpose is required to state a cause of action

against a nonactor"). For these reasons, plaintiff's common law conspiracy claim will be

dismissed.

5.  Halper's Motion for Sanctions

In addition to moving to dismiss the claims against him, Halper has also moved for

sanctions against Lokhova and her attorney Steven S. Biss, alleging that they have litigated this

action in bad faith. Halper argues that sanctions are warranted in part because Lokhova and her

counsel have "(i) us[ed] this Court to make, publicize and disseminate vulgar and degrading

accusations against Defendant Halper; (ii) ma[de] meritless accusations of defamation based

solely on alleged statements that are not actually contained in the media publications they cite;

[and] (iii) claim[ed] defamation based upon obviously untimely allegedly defamatory

statements." [Dkt. No. 36] at 1-2. Halper objects, for example, to the language used in plaintiff's

complaint and briefing, and to Lokhova's alleged posting of a link to her complaint on her

fundraising webpage. Halper has also filed a motion for leave to file a supplemental

memorandum in support of sanctions, which references an opinion issued by another judge in

this district warning Biss not to engage in <u>ad hominem</u> attacks, see <u>Steele</u>, 2019 WL 3367983, at

*3, and argues that notwithstanding that judge's opinion, Biss "has continued to file a series of

lawsuits, including in this Court, disparaging parties, witnesses, and their counsel." [Dkt. No. 85]

at 1-2. Biss has opposed both of these motions on Lokhova's behalf. [Dkt. Nos. 54, 86].

The record is clear that Biss filed an excessively long complaint and amended complaint

on Lokhova's behalf directing unprofessional <u>ad hominem</u> attacks at Halper and others. For

example, the complaint calls Halper a "ratf***er," Compl. ¶ 1, and refers to the media

defendants as "stooges," Compl. ¶ 21. Such language adds nothing but unnecessary heat to this

litigation. Moreover, the complaint exaggerates the nature and content of the allegedly

defamatory statements. In addition, Biss and Lokhova had to have known that most of her claims

were time-barred, as she had previously filed an unrelated defamation lawsuit in the United

Kingdom, which was dismissed as untimely under the one-year statute of limitations applicable

in that jurisdiction. See [Dkt. No. 36-2] at 25.

Whether to impose sanctions based on litigation conduct "ought to be exercised with

great caution," <u>Royal Ins. v. Lynnhaven Marine Boatel, Inc.</u>, 216 F. Supp. 2d 562, 567 (E.D. Va.

2002) (internal quotation marks omitted). Although the Court does not condone the tactics

employed by Biss and Lokhova in this action, their conduct is not sufficient to warrant the draconian measure of imposing sanctions at this time. The allegations of improper behavior by Biss are undoubtedly more severe than those by Lokhova, and should Biss file further inappropriate pleadings or pursue frivolous post-judgment litigation against any of these defendants, sanctions might well be justified. For these reasons, Halper's motions for sanctions and to supplement that motion will be denied without prejudice.

## III. CONCLUSION

For the above-stated reasons, the defendants' motions to dismiss will be granted, Halper's motion for sanctions and motion for leave to file a supplemental memorandum in support of sanctions will be denied without prejudice, and the claims against all named defendants will be dismissed by an Order to be issued with this Memorandum Opinion.

Entered this _27_ day of February, 2020.

Alexandria, Virginia

_/s/_

Leonie M. Brinkema
United States District Judge

ATTACHMENT A

LOG IN

ADVERTISEMENT

# *Justice Dept. Watchdog's Review of Russia Inquiry Is Nearly Done, Barr Says*

Justice Dept.: Watchdog's Review of Russia Inquiry Is Nearly Done, Barr Says - The New York Times



The Justice Department inspector general is examining the steps that law enforcement officials took to get a court's permission to secretly wiretap Carter Page, a former Trump campaign foreign policy adviser.  Pavel Golovkin/Associated Press

By Adam Goldman and Charlie Savage

April 9, 2019

WASHINGTON — The Justice Department's internal watchdog intends to complete by May or June his investigation into aspects of the Russia inquiry, including whether law enforcement officials abused their powers in surveilling a former Trump campaign aide, Attorney General William P. Barr told lawmakers on Tuesday.

The department's inspector general, Michael E. Horowitz, has been examining how law enforcement officials obtained a warrant in October 2016 to wiretap Carter Page, a former foreign policy adviser to the Trump campaign with links to Russia. Mr. Horowitz's investigators have also asked witnesses about informants that the F.B.I. turned to in the early stages of the investigation, according to people familiar with his inquiry.

"The office of the inspector general has a pending investigation of the FISA process in the Russia investigation," Mr. Barr said in testimony before a House appropriations subcommittee, using shorthand for the Foreign Intelligence Surveillance Act. "I expect that will be complete in probably May or June, I am told. So hopefully we'll have some answers from Inspector General Horowitz on the issue of the FISA warrants."

A spokesman for Mr. Horowitz declined to comment on the timing of the expected report. But the inspector general has previously confirmed that he was looking into the early stages of the Russia inquiry, including wiretap applications, informants and whether any political bias against Mr. Trump influenced investigative decisions.

Mr. Horowitz's findings could once again upend the Justice Department and F.B.I., which have been at the center of a political firestorm since the 2016 presidential election over their handling of separate investigations into both Hillary Clinton's use of a private email server and ties between Russia and the Trump campaign. The highly anticipated results of the Russia inquiry are due to be made public "within a week," Mr. Barr said on Tuesday.

In the Russia investigation, Republicans have accused law enforcement officials of improperly obtaining the Page warrant because the application relied in part on Democratic-funded opposition research compiled into a dossier by Christopher Steele, a former British intelligence officer who was also an F.B.I. informant.

At issue is whether the F.B.I. and Justice Department made any misrepresentations to the secretive Foreign Intelligence Surveillance Court when seeking the warrant, or if they should have flagged any concerns about the credibility of the information in the application during renewals. If the inspector general finds fault with the F.B.I., it could help validate Republican accusations that the Russia investigation was politically motivated.

Mr. Trump's allies have sought to reduce the inquiry to the problematic Steele dossier and to portray the Page wiretap application as its central feature. However, the bureau opened the counterintelligence investigation into Russia's election meddling — including scrutinizing links to the Trump campaign — based on other information, and without the dossier.

And the Page wiretap was only a small part of the broader Trump-Russia investigation: The inquiry involved more than 2,800 subpoenas, nearly 500 search warrants and about 500 witness interviews, Mr. Barr wrote in a letter to Congress describing the conclusions of the coming report by Robert S. Mueller III, the special counsel who took over the investigation in May 2017.

Law enforcement officials were also granted three renewals of the wiretap from the surveillance court; Rod J. Rosenstein, the deputy attorney general and a Trump administration appointee, signed the last renewal application, which was granted in June 2017.

As part of his investigation, Mr. Horowitz is scrutinizing the F.B.I.'s relationship with Mr. Steele, who provided the politically charged information to the agents trying to determine whether any of Mr. Trump's associates were secretly working with the Russian government's campaign to meddle in the 2016 election.

Top F.B.I. officials received the Steele information in September 2016 as they were debating whether to obtain the secret warrant to surveil Mr. Page. Among claims that Mr. Steele compiled from sources was that Mr. Page secretly met a Russian official promising compromising information about Hillary Clinton during a visit to Moscow in July 2016 — an accusation Mr. Page has denied.

Critics have argued that the court should have been explicitly told that the research was funded by the Democratic National Committee and the Hillary Clinton campaign, arguing that the court did not know that the information had potentially biased origins.

Justice Department practice in filling out applications for secret wiretaps is to avoid naming Americans or American organizations, and the application contained a lengthy footnote alerting the court that an unnamed person who commissioned Mr. Steele's research was "likely looking for information to discredit" Mr. Trump's campaign.

The footnote went on to explain to the court that Mr. Steele had "provided reliable information to the F.B.I." in earlier investigations and that based on that history, the bureau believed his latest information was "credible."

The inspector general has also been examining Mr. Steele's contributions to previous F.B.I.'s investigations, according to the people familiar with the inquiry. Investigators for Mr. Horowitz have asked about his role in helping the bureau investigate corruption at FIFA, the governing body of world soccer, suggesting that one focus of his is whether the bureau exaggerated Mr. Steele's previous history with the bureau in its application to wiretap Mr. Page.

One of the debates surrounding the F.B.I.'s use of information from the Steele dossier in the application is whether it was all crucial to meeting the standard for eavesdropping on Mr. Page's phone calls and emails.

Asked whether he would have signed off on submitting the application if it did not contain that allegation, James A. Baker, who was the general counsel of the F.B.I. when it first sought permission to wiretap Mr. Page, called the allegation about Mr. Page's visit to Moscow in 2016 "an important" part of the factual case for surveillance.

"I am not going to sit here and say that there wouldn't have been probable cause or that there would have been probable cause without the dossier," Mr. Baker told lawmakers in the fall who were scrutinizing law enforcement officials' actions during the 2016 election, according to a transcript of his testimony released on Tuesday.

But, he also said, "there were other things in that application that to me were alarming, as well."

Another F.B.I. lawyer involved in obtaining the warrant, Sally Moyer, told the same committees in October that it was "a close call" but "I think we would have gotten there on probable cause even without the Steele reporting," a transcript of her testimony showed.

In publicly released documents, the F.B.I. said it had decided to end its relationship with Mr. Steele in November 2016 after he spoke to the news media about his work for the F.B.I. after bureau officials had asked him not to do so.

The inspector general is also scrutinizing another early source of information for the Russia investigation, the people said: Mr. Horowitz's investigators have been asking questions about the role of Stefan A. Halper, another F.B.I. informant, and his prior work for the bureau.

Agents involved in the Russia investigation asked Mr. Halper, an American academic who teaches in Britain, to gather information on Mr. Page and George Papadopoulos, another former Trump campaign foreign policy adviser.

However, Mr. Halper also had additional contacts with other Trump officials that have raised concerns about his activities. In one instance, Mr. Halper reached out to Sam Clovis, a Trump campaign aide; it was not clear whether Mr. Halper had the F.B.I.'s blessing to contact Mr. Clovis.

Mr. Halper's contacts have prompted Republicans and the president to incorrectly accuse the F.B.I. of spying on the campaign. Mr. Page has also said he met with Mr. Halper in mid-July 2016, about two weeks before the Russia investigation was opened.

In addition, the inspector general is examining Mr. Steele's contacts with Bruce Ohr, a Justice Department official, according to the people familiar with the inquiry. Mr. Ohr, an expert on Russian organized crime and

himself <u>a frequent target of Mr. Trump's ire</u>, spoke with Mr. Steele several times after the F.B.I. terminated its relationship with the former British spy, and relayed information from those conversations to the bureau.

Mr. Barr, who was sworn in two months ago, also said that as he was awaiting the outcome of that inquiry, he was studying the F.B.I.'s decision in 2016 to begin investigating ties between Russia and Mr. Trump's campaign, "trying to get my arms around all the aspects of the counterintelligence investigation that was conducted during the summer of 2016," he said.

Go to Home Page »

**NEWS**

**OPINION**

**ARTS**

**LIVING**

**LISTINGS & MORE**

© 2020 The New York Times Company

NYTCo   Contact Us   Work with us   Advertise   T Brand Studio   Your Ad Choices   Privacy   Terms of Service   Terms of Sale
Site Map   Help   Subscriptions

ATTACHMENT B

The Washington Post

Politics

# Cambridge University perch gave FBI source access to top intelligence figures — and a cover as he reached out to Trump associates

By Tom Hamburger,
Robert Costa and
Ellen Nakashima
June 5, 2018

CAMBRIDGE, England — Before Stefan A. Halper emerged at the center of a political storm over the FBI's Russia investigation, he was a familiar face among the Gothic buildings and on the twisting river paths at the University of Cambridge, where he was known as a foreign policy expert with a network of intelligence sources cultivated over decades.

For 15 years, Halper convened seminars, informal dinners and apartment gatherings in Cambridge with leading academics and onetime leaders of the British spy services.

His perch as a Cambridge professor gave Halper, a veteran of three Republican administrations, the chance to mingle with figures such as then-Defense Intelligence Agency chief Michael Flynn and Vyacheslav Trubnikov, former director of the Russian Foreign Intelligence Service.

It also gave him a valuable cover to assist the FBI in a secret operation — investigating Russia's efforts to interfere in the 2016 White House race.

Halper, a longtime source of information for U.S. intelligence and law enforcement personnel, used his position at Cambridge to reach out to three Trump advisers in 2016, introducing himself as a scholar interested in discussing foreign policy, according to people familiar with the interactions.

Recent revelations that the 73-year-old academic was a confidential source for the FBI have fueled President Trump's attacks on the Justice Department and the FBI. "Spygate," as the president put it in a tweet, is a "scandal the likes of which this country may never have seen before!"

There is no evidence that a spy was embedded inside the Trump campaign, as the president and his allies have suggested. Former Justice Department and intelligence officials said Halper's work appeared to be routine — occasionally supplying limited information for a broad FBI inquiry into Russian efforts to intervene in U.S. politics.

However, there are lingering questions about his role — including how he was activated and why his first contact with a then-little-known Trump adviser, Carter Page, came weeks before the Justice Department investigation was officially opened.

It is also unclear how long Halper — who remained in touch with Page until at least July 2017 — assisted the FBI in the probe.

Halper declined to comment. The FBI declined to comment.

To colleagues and friends, Halper's participation in the case was appropriate for an experienced former White House official with access to individuals already of interest to investigators.

"He is a well-regarded academic who is also a patriot," said Richard Dearlove, who is the former head of Britain's MI6 intelligence agency and has known Halper since the two met at Cambridge in 2004.

A former U.S. official described Halper as a peripheral figure in intelligence circles — someone who is unofficially "part of the family" and is trusted to take on low-risk tasks at the government's behest.

Halper's identification as a secret FBI source has roiled this prestigious university, whose long history of connections to clandestine services has both brought scandal and bolstered its reputation.

During the Cold War, British intelligence officer turned double agent Kim Philby and four other prominent Cambridge graduates known as the Cambridge Spy Ring spied on Britain for the Soviet Union.

The university also has been a recruiting ground for British intelligence officials — including Christopher Steele, an undergraduate in the 1980s who went on to work for two decades for MI6. After going into private practice, Steele produced a now-controversial research dossier about Trump in 2016 for a consulting firm working on behalf of Democratic presidential nominee Hillary Clinton's campaign. Friends of Halper and Steele say the two are not acquainted and did not work together during the 2016 campaign season.

The university did not respond to requests for comment on how Halper cited his Cambridge role during his outreach to Trump advisers. In a statement, a Cambridge spokesman noted that Halper, who taught international affairs and American studies, stepped down in 2015 with the honorary title of emeritus senior fellow of the Center of International Studies.

Cambridge faculty members declined to speak on the record to a Washington Post reporter who recently visited the campus, citing university instructions not to speak to the media about Halper without clearance.

Still, in a crowded hallway at the famed Cambridge Union on a recent evening, some professors privately fretted about whether the university's reputation had been damaged by the controversy.

**Halper's history**

Halper arrived to teach at Cambridge in 2001 with an impressive pedigree: He was a Stanford University graduate with two doctorates who spent years as a high-ranking U.S. government official.

Thanks in part to his then-father-in-law Ray Cline, who worked at the CIA, Halper landed a post in President Richard M. Nixon's White House as a young policy adviser. He ended up in the next two GOP administrations, working for President Gerald Ford's chiefs of staff and in President Ronald Reagan's State Department.

"My recollection of him early on during the Nixon-Ford period was that he was well educated and smart — and that he was very interested in letting you know that," recalled Stan Anderson, a Washington lawyer who served in the campaigns of Nixon, Ford and Reagan.

Halper developed powerful friends, such as former Navy secretary John F. Lehman, who worked with him on arms control and other defense issues. And he cultivated a wariness about the chaotic Russian economy that emerged after the fall of the Soviet Union.

"Beware of Russians bearing gifts," Halper wrote in 1996 in a column for the Christian Science Monitor that criticized the Clinton administration's approach toward Gazprom, the sprawling, state-controlled energy company in Russia.

At Cambridge, Halper was an active and gregarious presence in the Department of Politics and International Studies, according to students and faculty members.

He often hosted dinners for students at his apartment, where he would tell colorful stories about working for Nixon and Ford, according to students who know him, including a Post reporter who studied at Cambridge.

In cramped department quarters and coffee shops, he would trade stories and tidbits he had picked up from his network with groups of students who felt far away from American politics.

One former student called Halper "mysterious and captivating," recalling his penchant for recounting connections to powerful figures in the British and American national security establishment.

During this period, Halper formed a close bond with Dearlove, the now-retired head of MI6.

Together, they launched the Cambridge Security Initiative, which produced research for governments and other clients, modeled in part after the Rand Corp.

Together, the two also became active in the Cambridge Intelligence Seminar, established by another Cambridge professor, Christopher Andrew, formerly an official historian for the British domestic intelligence service, MI5.

All three were present for a 2014 visit by Flynn, then head of the Defense Intelligence Agency, who had agreed to speak to the Intelligence Seminar while traveling for Defense Department-related activities.

During a dinner Flynn attended, Halper and Dearlove were disconcerted by the attention the then-DIA chief showed to a Russian-born graduate student who regularly attended the seminars, according to people familiar with the episode. The student and a Defense Department official traveling with Flynn have denied that anything inappropriate occurred.

In late 2016, Dearlove and Halper resigned as conveners of the Intelligence Seminar, expressing concern that it could be a target of manipulation from the Kremlin because it received funding from a donor linked to Russia. Andrew, the founder of the program, called the allegation "absurd" in an interview with the Financial Times. He declined repeated requests for comment from The Post.

Dearlove has since rejoined the seminar, telling friends that his concerns have been resolved.

**First contact**

Exactly when Halper began assisting the FBI on the Russia investigation remains undisclosed.

The FBI formally opened its counterintelligence investigation into Russia's efforts to interfere in the presidential race on July 31, 2016. The probe was spurred by a report from Australian officials that George Papadopoulos, a young Trump aide, had boasted to an Australian diplomat of knowing that Russia had damaging material about Hillary Clinton.

Yet Halper's outreach to Trump advisers began weeks earlier.

In June, a doctoral student working for Halper called and emailed Page, an unpaid foreign policy adviser to the Trump campaign, and invited him to attend a July symposium about the U.S. presidential election at Cambridge, according to people familiar with the interactions.

Page, an energy financier with a doctorate from the University of London, had taken part in other academic conferences around the world and viewed this one as no different, he told The Post.

The university paid his discount airfare and put him up in a dorm room. The seminar was also attended by former secretary of state Madeleine Albright, former Minnesota congressman turned Washington lobbyist Vin Weber and James Rubin, former assistant secretary of state for public affairs under Albright in the Clinton administration, according to the agenda and people familiar with the event.

Page and Halper had a brief conversation at the event — an interaction Page described as pleasant but not particularly memorable.

"There has been some speculation that he might have tried to reel me in," Page previously told The Post. "At the time, I never had any such impression."

The Cambridge conference was held days after Page had traveled to Russia, where he had delivered a speech at Moscow's New Economic School that was, in part, critical of U.S. foreign policy.

Page had been on the FBI's radar since at least 2013, when the FBI caught two accused Russian spies on a wiretap discussing their attempts to recruit him. In the fall of 2016, he became a surveillance target of the FBI, which suspected him of acting on behalf of the Russian government — an assertion he denies. Page has accused the government of abusing its authority by unfairly targeting him.

After his return to the United States, Page visited Halper at his wooded six-acre estate in Virginia. The two talked about foreign policy and the political campaign. Halper gave him a copy of a book he wrote on China — a hawkish book that has also drawn the attention of current White House trade adviser Peter Navarro, who told Fox News last month that he has corresponded with Halper over the past two years about China.

Page wrote in a tweet that he and Halper were "just a few scholars exchanging ideas."

On Aug. 29, 2016, about six weeks after first meeting Page, Halper used that relationship to broker a contact with another Trump official: Sam Clovis, an Iowa academic who served for a period as the campaign's national co-chairman.

"I am a professor at Cambridge University lecturing on US politics and foreign policy. I am what is called a 'scholar practitioner,' having served in the White House and four presidential campaigns — two as policy director," Halper wrote to Clovis in an email. "Over the past month I have been in conversation with Carter Page who attended our conference in Cambridge on US elections. Carter mentioned in Cambridge, and when visiting here in Virginia, that you and I should meet."

The email, first reported by the Washington Examiner, was described to The Post by Clovis's attorney, Victoria Toensing.

In late summer, the two men met for coffee at a hotel in Northern Virginia, where they chatted about China. The professor asked Clovis whether they could meet again, but Clovis was too busy with the campaign. After the election, Halper sent him a note of congratulations, Toensing said.

Clovis did not view the interactions as suspicious at the time, Toensing said, but now is rethinking the interactions knowing that Halper had encounters with others in the campaign.

"To be infiltrating a presidential campaign within two or three months of an election campaign is outrageous," she said.

Days after meeting with Clovis, Halper sought out Papadopoulos, the third Trump aide.

People familiar with the outreach said it was done as part of the FBI's investigation. The young foreign policy adviser had been on the radar of the FBI since his meeting with the Australian diplomat triggered the formal opening of the probe that summer.

On Sept. 2, 2016, Halper invited Papadopoulos to join in some research he was conducting at Cambridge about the relationship between Turkey and the European Union, offering to pay him an honorarium of $3,000 for a 1,500-word paper, according to an email described to The Post.

Emails show Papadopoulos flew to meet Halper in London at the Travellers Club, a 200-year-old private men's club that is a favorite of British intelligence officers and foreign diplomats.

According to two people familiar with their conversation, Halper probed Papadopoulos about whether he had ties to Russia — a notion that Papadopoulos adamantly rejected.

After Papadopoulos returned to the United States and sent his research document, the professor responded: "Enjoyed your paper. Just what we wanted. $3,000 wired to your account. Pls confirm receipt."

Papadopoulos pleaded guilty in October 2017 to lying to the FBI about his outreach to Russia during the campaign and has been cooperating with the investigation.

For his part, Halper maintained contact with at least one Trump associate until at least the summer of 2017.

On July 28, 2017, the professor emailed Page, asking what his plans were — and referring to the ongoing Russia investigation.

"It seems attention has shifted a bit from the 'collusion' investigation to the 'contretempts' within the White House and, how — or if — Mr. Scaramucci will be accommodated there. I must assume this gives you some relief," Halper wrote in the midst of Anthony Scaramucci's turbulent stint as communications director.

"We are here in Virginia enjoying a warm but quiet summer," he wrote, adding: "Be in touch when you have the time. Would love to catch up."

*Costa and Nakashima reported from Washington. Devlin Barrett, Alice Crites, Shane Harris, Rosalind S. Helderman, Frances Stead Sellers, Julie Tate and Matt Zapotosky in Washington contributed to this report.*

**Tom Hamburger**
Tom Hamburger is an investigative reporter on the national desk of The Washington Post. He has covered the White House, Congress and regulatory agencies, with a focus on mon

**Robert Costa**
Robert Costa is a national political reporter for The Washington Post. He covers the White House, Congress, and campaigns. He joined The Post in January 2014. He is also the mod

**Ellen Nakashima**
Ellen Nakashima is a national security reporter for The Washington Post. She covers cybersecurity, surveillance, counterterrorism and intelligence issues. She has also served as a

Get a year of access for $29. Cancel at any time.

Get this offer now

Send me this offer

Already a subscriber? Sign In