1

```
 1                    UNITED STATES DISTRICT COURT
                  FOR THE EASTERN DISTRICT OF VIRGINIA
 2                         ALEXANDRIA DIVISION

 3   SVETLANA LOKHOVA,              .     Civil Action No. 1:19cv632
                                    .
 4               Plaintiff,         .
                                    .
 5       vs.                        .     Alexandria, Virginia
                                    .     October 25, 2019
 6   STEFAN A. HALPER;              .     10:00 a.m.
     DOW JONES & COMPANY, INC.;     .
 7   THE NEW YORK TIMES COMPANY;    .
     WP COMPANY, LLC, d/b/a         .
 8   Washington Post;              .
     NBCUNIVERSAL MEDIA, LLC,       .
 9   d/b/a MSNBC; and MALCOLM       .
     NANCE,                         .
10                                  .
                 Defendants.        .
11                                  .
     .  .  .  .  .  .  .  .  .  .  .  .
12
                     TRANSCRIPT OF MOTIONS HEARING
13            BEFORE THE HONORABLE LEONIE M. BRINKEMA
                   UNITED STATES DISTRICT JUDGE
14
     APPEARANCES:
15
     FOR THE PLAINTIFF:            STEVEN S. BISS, ESQ.
16                                 Law Office of Steven S. Biss
                                   300 West Main Street, Suite 102
17                                 Charlottesville, VA 22903

18   FOR DEFENDANT STEFAN A.       TERRANCE G. REED, ESQ.
         HARPER:                   ROBERT K. MOIR, ESQ.
19                                 Lankford & Reed PLLC
                                   120 N. Saint Asaph Street
20                                 Alexandria, VA 22314
                                     and
21                                 ROBERT D. LUSKIN, ESQ.
                                   Paul Hastings LLP
22                                 875 15th Street, N.W.
                                   Washinton, D.C. 20005
23
                   (APPEARANCES CONT'D. ON PAGE 2)
24
                         (Pages 1 - 45)
25
            COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES
```

2

1    <u>APPEARANCES</u>:  (Cont'd.)

2    FOR DEFENDANT DOW JONES &        MATTHEW E. KELLEY, ESQ.
          COMPANY:                    SETH D. BERLIN, ESQ.
3                                     Ballard Spahr LLP
                                      1909 K Street, N.W., 12th Floor
4                                     Washington, D.C. 20006

5    FOR DEFENDANT THE NEW YORK       JOHN F. HUNDLEY, ESQ.
          TIMES COMPANY:              Trout Cacheris & Solomon, PLLC
6                                     1627 Eye Street, N.W., Suite 1130
                                      Washington, D.C. 20006
7                                        and
                                      DANA R. GREEN, ESQ.
8                                     The New York Times Company
                                      Legal Department
9                                     620 8th Avenue
                                      New York, NY 10018
10
     FOR DEFENDANTS WP COMPANY,       PATRICK J. CURRAN, JR., ESQ.
11        LLC; and NBCUNIVERSAL       LAURA HANDMAN, ESQ.
          MEDIA, LLC:                 Davis Wright Tremaine LLP
12                                    1919 Pennsylvania Avenue, N.W.
                                      Suite 800
13                                    Washington, D.C. 20006

14   ALSO PRESENT:                    SVETLANA LOKHOVA

15   OFFICIAL COURT REPORTER:         ANNELIESE J. THOMSON, RDR, CRR
                                      U.S. District Court, Third Floor
16                                    401 Courthouse Square
                                      Alexandria, VA 22314
17                                    (703)299-8595

18

19

20

21

22

23

24

25

3

1                P R O C E E D I N G S

2         THE CLERK:  Civil Action 19-632, Svetlana Lokhova

3   versus Stefan A. Halper, et al.  Will counsel please note their

4   appearances for the record.

5         MR. BISS:  Judge Brinkema, good morning.  I'm Steven

6   Biss for the plaintiff.

7         THE COURT:  Good morning.

8         MR. REED:  Good morning, Your Honor.  Terrance Reed,

9   Robert Luskin, and Robert Moir for the defendant Stefan Halper.

10        THE COURT:  Good morning.

11        MR. LUSKIN:  Good morning.

12        MR. HUNDLEY:  Good morning, Your Honor.  John Hundley

13  on behalf of The New York Times Company.  With me is Dana

14  Green, who is counsel at *The New York Times*.  She's been

15  admitted pro hac vice, and she'll be handling the argument on

16  behalf of *The Times* today.

17        THE COURT:  All right, thank you.

18        MR. HUNDLEY:  Nice to see you.

19        MR. CURRAN:  Good morning, Your Honor.  Patrick

20  Curran from Davis Wright Tremaine, on behalf of NBC and *The

21  Washington Post*, and with me is my colleague, Laura Handman,

22  who will be handling oral argument for both parties.  She's

23  been admitted pro hac vice.

24        THE COURT:  All right, good morning.

25        MR. KELLEY:  Good morning, Your Honor.  Matthew

4

1    Kelley for defendant Dow Jones & Company.  With me is my

2    colleague, Seth Berlin, who is admitted pro hac vice and will

3    be doing the oral argument.

4              THE COURT:  All right, thank you.

5              And I think local counsel are probably going to have

6    to sit in the -- outside of the well.  We just don't have

7    enough chairs for you-all, all right?

8              All right.  As you know, this case was originally

9    assigned to Judge Ellis, who asked that it be reassigned.  I

10   only got it on the basis of the random computer draw Monday,

11   and obviously, there's a great deal of material here.  I have

12   gone through not every single word but a good deal of it, so I

13   have a very strong idea about what's going on, but we're going

14   to use this morning as an opportunity for you, each side to

15   present any additional information that may not have been fully

16   covered in your papers.

17             So the first thing is I wanted to know, is there --

18   and I believe I'm correct on this -- is there any disagreement

19   among any of you that there is not a one-year statute of

20   limitations for defamation cases?  I believe everybody's

21   agreeable, whether we're using Virginia law, District of

22   Columbia law, or New York law, in all three jurisdictions, and

23   those are the only three whose law would be relevant here, that

24   it's a one-year statute of limitations.

25             Mr. Biss, I believe you agree with that.

5

1          MR. BISS:  I do agree with that, Your Honor, yes.

2          THE COURT:  All right.  And I believe all the defense

3    have argued that.

4                    (Defense counsel nodding heads.)

5          THE COURT:  All right, so that's it.  Well, then it

6    seems to me that that's the first issue that we have to be

7    talking about, and that is, all defendants have raised the

8    issue that with the exception of just three, arguably four

9    articles -- and I'm going to use the word "article" even though

10   I recognize that some of what we're talking about here are

11   tweets or some of the new type of electronic communications --

12   but what we're talking about here, it seems to me, are four

13   articles, that anything else that's referenced in the complaint

14   occurred outside of the one-year statute of limitations.

15          So, Mr. Biss, I think you have to address that issue

16   first.

17          MR. BISS:  Your Honor, may it please the Court.  I'm

18   Steve Biss.  I represent the plaintiff, Svetlana Lokhova.

19   Svetlana Lokhova is with me at counsel table.

20          Judge, the question here is republication.

21   Obviously, the articles were published on the dates as

22   represented in the complaint.  The question here is were they

23   republished and when were they republished.

24          So I start with the standard of review, because I

25   think it's intertwined into this issue, because I think the

1    question of what is a republication and when did it occur are

2    essentially issues of fact.   In paragraphs 5, 87, 98, 112, 122,

3    128, 158, 163, and 172 specifically, the plaintiff alleges that

4    there was a republication within one year preceding the filing

5    of this case.

6         We have cited in our briefs two cases and I want to

7    talk about a third case that, that is cited in one or more of

8    the defendants' cases.   It's a case within a case, but I want

9    to bring it to Your Honor's attention.

10        The two Virginia cases that talk about this issue of

11   republication are one from the Eastern District of Virginia and

12   one from the Western District of Virginia.   The Eastern

13   District case is the *Dragulescu* case that's cited -- and I hope

14   I pronounced that right, but I think it's right, right

15   enough -- the *Dragulescu* case, and that was a defamation case

16   involving the republication of defamatory statements, and what

17   the court held in that case is that each successive publication

18   of an old or preexisting defamatory statement gives rise to a

19   new cause of action under Virginia law, and that's a -- and I

20   believe they cited to a Fourth Circuit opinion, and it's in

21   our, in our briefs.

22        The other case is the Western District case, the case

23   that is a case that was decided in 2016 and thereupon on

24   summary judgment and thereafter tried to a verdict, it's the

25   *Eramo v. Rolling Stone* case, and the -- what Judge Conrad held

1   in that particular case was that republication occurs when the

2   original defamatory statement is affirmatively reiterated or

3   redistributed to a new audience.

4          And so it's with those -- it's with those two cases

5   and then, and then one other that was actually decided by the

6   Eastern District here in the Alexandria Division, and I think

7   it was Judge Ellis who decided it, it's a case that we also

8   cite, it's *Doe v. Roe*, and *Doe v. Roe* stands for the

9   proposition, and it says this exactly, that separate

10  publications of the same defamatory content constitute

11  republication, and there's a new -- the new statute of

12  limitation accrues with each republication.  So that that's the

13  legal framework in Virginia.

14         So the defendants in their briefs have raised this

15  issue of the hyperlinks, and it's a -- it's an issue that I

16  could not find any federal or state precedent in Virginia to

17  address this.  There are cases from New York.  There are cases

18  that I'm aware of from the Western District of Kentucky and

19  other jurisdictions, Pennsylvania.  There's a Third Circuit

20  case that the defendants cite that talk about the hyperlinks.

21         Now, we have alleged in the complaint -- and my first

22  point is we have alleged republication, and I, and I submit to

23  Your Honor that is sufficient -- in alleging a defamation case,

24  that's sufficient to take it past the 12(b)(6) stage, because

25  the question then arises what was republished.  It's a factual

1   issue as to what it was that was republished within the one

2   year.  Was it simply a hyperlink, or was it a hyperlink plus

3   content?

4           In the, in the defendants' cases, there's a case they

5   cite of the *Biro v. Condé Nast* case, and in *Biro v. Condé Nast*,

6   there's a discussion of whether or not the, the simple

7   republication of a hyperlink is sufficient, and in *Biro*, they

8   said it wasn't sufficient, but in *Biro*, they cite to a case

9   called *Enigma Software*, and that's at 194 F.Supp.3rd 263, and

10  it's a Southern District of New York case from 2016, and in

11  that case, the Southern District of New York very clearly and

12  emphatically pointed out that where, where there's a tweet that

13  includes the plaintiff's name and additional -- republishes

14  additional content from the prior publication, that is

15  sufficient to constitute a, a republication.

16          I submit to Your Honor I don't think the Court can

17  resolve these factual issues as to what was included in, in the

18  tweets, what was a part of the republication, whether it

19  included content or whether it didn't include content.  I

20  submit those are factual issues.  They could be raised and

21  might be raised on summary judgment, but they might not be

22  raised on summary judgment.

23          At this stage, the plaintiff has to allege a

24  republication, and I know from looking at multiple of the

25  tweets that were, were made in the last -- within the last

1    year, that content was certainly republished, content such as

2    Ms. Lokhova compromised General Flynn, Ms. Lokhova is a, is a

3    Russian intelligence official.

4           THE COURT:  Well, why should the law, though, given

5    the nature of the way in which people are communicating these

6    days, why should the law not be that the tweeter be the one

7    held liable?  Because the danger, and this has been recognized,

8    you know, in cases, is that to the extent that one accepted

9    your argument that every time somebody tweets a prior article,

10   that somehow that changes the statute of limitations, you'd

11   essentially have no rational statute of limitations any longer.

12          So there has to be some rule of reason that would

13   actually temper the approach that you're taking.

14          MR. BISS:  Judge, I understand -- I fully understand

15   that.  On the other side of that equation, though, is a

16   counterbalancing interest of protecting the reputation of the

17   person who has been defamed.

18          So today, as Your Honor correctly pointed out, we

19   live in a different time.  Now you can hit a button on your

20   phone or on a computer, and you can send a defamatory message

21   to 30,000 people, and then they in an instant can resend it to

22   a million or more people.

23          And so I think the counterbalancing interest here is,

24   is outweighed by protecting the -- in this modern age, by

25   protecting the rights of the individual, the liberty interest

1   of the individual in their name and reputation by holding the

2   original defamer liable for interjecting the message, the

3   defamatory post, if you will, into the stream of commerce,

4   because once it gets into the stream of commerce, then these

5   devices allow anybody to republish it, to over and over and

6   over.

7          The, the -- in the, in the case of *Adelson v. Harris,*

8   this was a case involving a hyperlink, this is a case that was

9   referred to in one of the cases, it's *Adelson v. Harris* at 973

10  F.Supp.2d 467, this is a Southern District of New York case,

11  and it was a question of a hyperlink.  It was a hyperlink in an

12  article, and the question was what is a hyperlink, and that,

13  that got me looking at the case, and in the *Adelson* case, they

14  defined a hyperlink as the 21st Century equivalent of a

15  footnote.  That's what they defined a hyperlink as.

16         And if that's the case, then publishing the hyperlink

17  is essentially directing the, the -- is essentially

18  republishing the defamatory statement in the form of a

19  footnote.

20         The SEC, the Securities and Exchange Commission, in

21  Release No. 33-7233, this is also cited in *Adelson*, said that

22  providing hyperlinks on an online offering is akin to including

23  the contents of the second cite in the same envelope as the

24  prospectus, and, Judge, from the plaintiff's perspective in

25  this case, including -- for a third party to include those

1   hyperlinks is essentially a republication of the same

2   defamatory material, because the hyperlink serves as the -- as

3   essentially the equivalent of a footnote according to the, the

4   *Adelson* case at page 484.

5          And it happens --

6          THE COURT:  I'm sorry, but then under that theory,

7   the third party who does that might be liable.

8          MR. BISS:  And there's no --

9          THE COURT:  And, I'm sorry, within the evidence

10  that's in this record, as I understand it, there's only -- only

11  *The New York Times* has one article that would have been

12  hyperlinked that might be within the statute of limitations if

13  the Court accepted your theory, but that doesn't save, for

14  example, *The Wall Street Journal*, which I don't believe there

15  are any of their articles where they themselves then

16  hyperlinked to a prior article.

17         MR. BISS:  Judge, the, the -- *The Wall Street Journal*

18  article was, was hyperlinked -- and I just -- for purposes of

19  preparing today's argument, I took three examples from the

20  allegations in the complaint of publications -- of hyperlinked

21  publications by third parties within the, within the one-year

22  statute of limitations.

23         THE COURT:  Yeah, but that's third parties, and if

24  you're looking at a hyperlink as a footnote, then that third

25  party published that footnote, and it seems to me that there

1   *The Wall Street Journal* would not be liable.   If *The Wall*

2   *Street Journal* itself hyperlinked to its own article, it seems

3   to me that there might be then, might be then a basis to find

4   that that article had been dragged into the statute of --

5   within the statute of limitations.

6          But even *Weaver* recognized, and that's the seminal

7   case that I think you really based your initial argument on,

8   which is a Virginia Supreme Court case from, what, 1950, before

9   the internet, I think, was even invented, and so obviously

10  didn't have any concept of the new way in which people

11  communicate and disseminate information, but even that case did

12  draw some distinction between republication by the original

13  person or by third parties, and I think that's a line that has

14  to be carefully considered.

15         MR. BISS:   I, I agree with that, but I think that

16  the, the end result is exactly the same.   So if the original

17  defamer republishes, that's a -- that's a republication for

18  which the original defamer is liable, but by the same token,

19  under *Weaver*, the original defamer is liable for a

20  republication by third parties under the common law, and *Weaver*

21  stands for that proposition, and it was a 1957 case, but it was

22  cited with -- it was cited with authority by the Eastern

23  District of Virginia, I believe, in *Dragulescu*, and it is --

24  it's the, it's the law as far as I can tell up until this day.

25  Without any question, it's the law in, in Virginia.

1              So in the, in the content -- in the context of -- in

2    the context of modern business, it also makes sense to

3    recognize that a hyperlink is a republication, because a lot of

4    these internet companies, take Twitter, for example, Twitter

5    will publish terms of service, and it will, it will publish

6    a -- it will link those terms of service with a hyperlink.  So

7    when you set up an account with Twitter, you have to click on

8    the hyperlink in order to -- they don't publish the terms of

9    service, but they're just -- it's just a hyperlink which you're

10   obligated to click on if you, if you want to click on it, but

11   if you don't click on it, you're still bound by it.

12             My point is that in modern business, we also

13   recognize that the hyperlink serves a useful purpose, and that

14   is, it constitutes a publication of facts succinctly by means

15   of a -- by means of a, of a bridge or by means of an

16   electronic, what they, what they described in the *Adelson* case

17   as highlighted text or image that permits a reader to view

18   another document.  That's how they, they identified and defined

19   a hyperlink.

20             But in terms of modern business, we treat it as a

21   publication that, that allows, facilitates now, facilitates the

22   much more economical presentation of material.

23             In our case, we've alleged republication.  It's a

24   factual issue as to what these tweets that are in the

25   amended -- in the amended complaint say, whether they include

14

1  simply hyperlinks or whether they include hyperlinks and more.

2          And, Judge, I think that's a factual issue that takes

3  it beyond the 12(b)(6) stage.

4          THE COURT:  All right.  Let me hear then from defense

5  counsel as to the issue of republication.  And because there

6  are so many of you, I'm going to ask you once again to

7  reidentify yourselves and which party you represent.

8          MR. BERLIN:  Good morning, Your Honor.  I'm Seth

9  Berlin, appearing on behalf of Dow Jones *Wall Street Journal*.

10  Let me see if I can try and unravel a little bit of what

11  Mr. Biss is saying.  To start, Your Honor is correct that the

12  original *Wall Street Journal* article that it published was two

13  years and two months before the complaint was filed, and so

14  claims premised on that article are clearly barred by the

15  statute of limitation, and I understand Mr. Biss to be saying

16  he agrees with that.

17          What we're talking about is in the case of *The Wall

18  Street Journal*, four tweets that are identified in paragraph

19  112 of the complaint that are indisputably published by

20  somebody else, not *The Wall Street Journal*, and include a

21  hyperlink, okay?

22          That is not the subject of a defamation action for

23  three reasons:  Number one, that's not publication, right?  A

24  hyperlink is not publication.  The cases are uniform in this.

25  There's a -- there are both Third Circuit and Sixth Circuit

1    cases that collect a mass of authority.

2           In the *Adelson* case which Mr. Biss references, which

3    was conveniently for me my case, the reference to the 21st

4    equivalent of a footnote is exactly that.  If, if *The Wall*

5    *Street Journal* published an article and someone later cited to

6    that article in a footnote in a book, that is not a

7    republication of *The Wall Street Journal* either for the author

8    of that book and especially not for *The Wall Street Journal*,

9    and if that's the analogy, that's essentially what a hyperlink

10   does in modern -- a modern America.  That's what Judge Oetken

11   in a very thoughtful opinion discussing it at length came to

12   the conclusion in the *Adelson* case.

13          So that's not a publication, number one.  So the

14   first thing you would need for a defamation claim within the

15   statute of limitations is publication, and you don't have that.

16          Here you have a second thing, which is that if you

17   look at those four tweets that are identified, none of them is

18   themselves published within the one year prior to the filing of

19   the complaint.  So even if that constituted publication, it's

20   not publication within one year of the filing of the complaint,

21   regardless of what they said, right?

22          And in that regard, I should add that Mr. Biss says

23   it's a factual issue with what else got published with the

24   hyperlink, right?  Well, first of all, that's pled in the

25   complaint, so that's something that we can do based on the

1    pleadings; but second, somebody else's additional comments are

2    not chargeable to *The Wall Street Journal*.  The only thing

3    that's chargeable potentially to *The Wall Street Journal* is

4    what it published and somebody republished.

5            So what's really going on here is Mr. Biss is relying

6    on the principal that's articulated in that 1957 case of *Weaver*

7    to say somehow, even though *The Wall Street Journal* didn't

8    publish it, it's not publication and it's not within the year,

9    *The Wall Street Journal* somehow is still responsible for that

10   because it was the natural and probable consequence of the

11   original publication that somebody would retweet that, and that

12   is barred by the single publication rule, which basically

13   tweets the date of publication for a mass media publication as

14   the first date on which it's made available to the public,

15   which in this case is two years and two months prior to the

16   filing of the complaint and is similarly true, I believe, for

17   the other -- the defendants that Your Honor alluded to.  So

18   under the single publication rule, there would be no claim.

19           And what Mr. Biss is essentially arguing, as I

20   understand it, is that somehow the *Weaver* approach is an

21   exception to the single publication rule, but that's not true

22   even under *Weaver* itself, because *Weaver* involved a letter that

23   was written by a lender, the defendant, to the Navy, right, and

24   isn't involving a mass media publication, and it expressly

25   says, hey, there's different rules for mass media publications,

1   and it cites another case from in that case the Third Circuit

2   that recognized the single publication rule, and it then went

3   on to say that the publisher of a newspaper or magazine is not

4   responsible for the acts of third persons who after the

5   original publication sell or distribute copies of the newspaper

6   or magazine to others.

7           That's exactly what we're talking about here, albeit

8   in the context not of the internet but in print publication.

9           The cases that Mr. Biss references actually support

10  this position.  So if you look at the *Dragulescu* case, which

11  is, I believe, Judge Payne's decision from the Richmond

12  Division, Judge Payne -- and that's a case again about a

13  non-mass media publication, and he says:  Even applying it in

14  that context, the single publication followed by successive or

15  additional readings of the publication gives rise to only one

16  cause of action.  This single publication rule applies when

17  subsequent audiences read the same original (and allegedly

18  defamatory) document, and is accepted by the majority of states

19  and Virginia.

20          It then takes up *Weaver*, right?  So the plaintiff in

21  that case, like Mr. Biss said, well, what about *Weaver*?  And

22  the, the plaintiff argues that -- this natural and probable

23  consequence argument, and it says:  *Dragulescu* argues that this

24  principle saves her defamation claim.

25          It does not, and it goes on to explain that even in

1    that case, that is not sufficient to overcome the premise of

2    the single publication rule.

3         The same is true in *Doe v. Roe*, where the court --

4    let me flip my page here -- the court again invokes the single

5    publication rule.

6         And so what we have here, Your Honor, is we have no

7    case that I'm aware of in which a mass media publication is

8    subject to *Weaver*, and we have a number of cases involving

9    individual non-mass media publications where judges of this

10   Court are applying the single publication rule.  *Katz v. Odin*

11   is another one that Judge Ellis decided, and it's cited in the

12   parties' papers where that's the case.

13        And so given all of that, Your Honor, there is no --

14   there is no publication that occurs within the one-year statute

15   of limitations that would allow a claim to proceed.

16        And let me just say one last thing, if I could, about

17   *Weaver*, Your Honor.  In that case, as I mentioned, it was a

18   letter written to the Navy, and one of the things that was

19   specific to that case was that the letter went on to say:  We

20   feel that if someone in a supervisory position will explain

21   Mr. Weaver's liabilities and the possible effects of them, he

22   will be induced to bring his account to date and pay promptly

23   thereafter.  They were trying to collect a debt, right?

24        So the court found in that unique set of

25   circumstances that a jury could conclude from that statement

1  that appellees were requesting that the letter be republished

2  to his supervisors, right?  We're writing a letter saying:

3  Please pass this along to his supervisors so they'll talk to

4  him.

5           And in those circumstances, when they then go and

6  pass it along to his circumstances (sic), that is held to be

7  the natural and probable consequence of writing such a letter

8  in that one case.

9           But in the case of a newspaper or a magazine or book,

10  any other mass media publication, if it were the case that

11  simply by virtue of publishing it, you expected that it would

12  be circulated, that would swallow both the single publication

13  case and the one-year statute of limitations, and no court has

14  so held.

15           THE COURT:  All right.

16           MR. BERLIN:  Unless Your Honor has any questions,

17  I'll sit down.

18           THE COURT:  Are there any other defense attorneys who

19  want to address the statute of limitations issue on behalf of

20  their clients?

21           MS. GREEN:  Your Honor, Dana Green on behalf of *The*

22  *New York Times*.

23           THE COURT:  Yes, ma'am.

24           MS. GREEN:  We agree with all the points that

25  Mr. Berlin has raised on behalf of his client.  As Your Honor

1    noted, *The New York Times* is in a somewhat different position

2    from Dow Jones in the sense that there is at least one pleaded

3    retweet that is within the statute of limitations.  For the

4    reasons that Mr. Berlin just articulated, however, we do not

5    believe that that can as a matter of law be deemed to be a

6    republication of *The New York Times article.*

7            *The Times* article, as Your Honor knows, was published

8    more than a year before the complaint was filed.  Mr. Biss has

9    argued that there are questions of fact around whether or not

10   it was republished.  Our position would be that republication

11   is a question of law; and the facts around how this article was

12   tweeted or published are not in dispute; they're in the

13   complaint; and that there's no reason why this can't be

14   resolved on a motion to dismiss.

15           There's no allegation in the complaint that *The Times*

16   itself retweeted or republished this during the statute of

17   limitations.  The sole allegation is that a journalist for *The*

18   *Daily Caller* posted a tweet hyperlinking to *The New York Times*

19   article and making a very brief comment about it.

20           I think that the -- there are two barriers to

21   treating that as a republication.  The first is the hyperlink

22   issue, which we've just discussed, but even setting aside that

23   technological issue, the result would be the same if that

24   journalist from *The Daily Caller* had, for example, printed out

25   *The New York Times* article and handed it out to his friends or

1    posted it online.

2           The, the *Weaver* case creates a very narrow exception

3    that in special circumstances can allow a third party to

4    essentially create liability for the publisher, but the facts

5    from *Weaver* and all of the cases that have subsequently applied

6    it are highly distinguishable from the circumstances here,

7    where there has to be some deliberate intent, some, some clear

8    expectation by the initial publisher that they are transmitting

9    it to a third party who will then republish it.

10          And here, Mr. Biss's position seems to be the only

11   thing that would bring *The New York Times*'s article within the

12   *Weaver* exception is that it is a national news publication.

13   There's no other distinguishing feature here, and if that were

14   adopted, essentially every national news article would have

15   perpetual liability because they are frequently commented on or

16   distributed or retweeted.

17          Mr. Biss seems to argue that now technology means

18   that we should rethink that single publication rule, but the

19   whole purpose of the single publication rule, the reason it was

20   developed -- and we discussed this in our reply, and I would

21   direct Your Honor to the *Gregoire* case from New York that has a

22   very interesting historical discussion of the origins of the

23   single publication rule.  The whole idea behind that was that

24   in an era of mass media, we, we must -- to make the statute of

25   limitations effective, we cannot impose liability on publishers

22

1    for third-party distribution and selling and footnoting and

2    other distribution of a publication.  Otherwise, the single

3    publication rule would have no meaning.

4            So in contrasting Mr. Biss's position, I would say

5    the development of new technology, the fact that retweets are

6    happening is very much in favor of finding that there is no

7    republication here, that the whole purpose of the single

8    publication rule is to prevent perpetual liability for mass

9    media such as *The Times* and the other defendants.

10           THE COURT:  All right, thank you.

11           MS. HANDMAN:  Your Honor, Laura Handman, Davis Wright

12   Tremaine, on behalf of NBCUniversal Media and WP Company,

13   publisher of *The Washington Post*.  I'll be extremely brief.

14           *The Washington Post* article that's in suit is within

15   the statute of limitations.  We don't disagree that that is

16   within the statute.

17           And there are two tweets by -- from the personal

18   account of Malcolm Nance which are alleged -- he is a

19   contributor for NBC/MSNBC -- two July 2018 tweets that we don't

20   say the statute of limitations bars, but there are tweets from

21   2017 that are barred, and in the amended complaint, plaintiff

22   added a broadcast of -- *Rachel Maddow* broadcast of May 18,

23   2018, and the *11th Hour* broadcast of May 18, 2018.  That's more

24   than a year before plaintiff filed his complaint.

25           And notably, unlike these others, there's no

23

1    allegation of retweeting.  Mr. Biss, when he recited the

2    paragraphs of the complaint, he stopped right at the point

3    where republication was alleged, he stopped right at the point

4    where there's discussion of the NBC liability, and there are no

5    allegations of retweets within the statute of limitations as to

6    any of those more-than-one-year broadcasts in tweets.

7            THE COURT:  All right, thank you.

8            MR. REED:  Good morning, Your Honor.  Terry Reed on

9    behalf of the defendant Stefan Halper.  First, I would endorse

10   the comments of other defense counsel on the statute of

11   limitations issues, and I'll just briefly add one point.

12           This Court was looking for some rule of reason with

13   respect to application of the republication doctrine, and

14   fortunately, there is such a rule of reason.  It's in the

15   original 1957 case, the *Weaver* case, and that is, for the

16   republication to start a new claim or a new statute of

17   limitations, the original publisher has to in some way

18   authorize or participate in the, in the republication.

19           Here, what the, what the plaintiff is attempting to

20   say is that simply if you have a publication and then someone

21   else uses the internet to talk about that subject matter, that

22   that is a republication.

23           That is a -- that is a completely independent

24   publication by a third party, and therefore, as the Court

25   points out, that is the third party's responsibility, not the

1    original publisher.

2           And if ever there was a technological entity where

3    that should apply, it would be the internet because no one has

4    control over what someone else says over the internet.  By

5    definition -- I mean, it might be possible to organize the

6    campaign, but that's not what's being alleged here, and more

7    importantly, that's not what's in the, in the complaint.

8           Mr. Biss talks about the pleading.  There's no

9    pleading here that Mr. Halper had any involvement in any of

10   these internet publications or tweets or anything like that.

11   So to the extent that he wants to put the republication

12   doctrine to work, to turn the internet into the Fountain of

13   Youth for defamation claims, he hasn't even pled the necessary

14   facts to make that argument.

15          THE COURT:  All right.

16          MR. REED:  Thank you.

17          THE COURT:  Well, the other issue, assuming that the

18   Court were to find -- and we do have *The Washington Post*, the

19   two Nance articles, and possibly the one *New York Times* article

20   within the statute of limitations.  Then the second line of

21   arguments that has been made is that the articles at issue are

22   themselves not defamatory and that the Court has to make that

23   decision.  That's a question of law.

24          And so, Mr. Biss, again, I'll let you respond to

25   those arguments.  And again, we're confining ourselves at this

1    point for the sake of discussion to just the ones that are

2    within the statute of limitations.

3           MR. BISS:  Yes, Your Honor.  Just very, very briefly

4    on the MSNBC, there's one other publication that is within the

5    statute of limitations.  It's in a December 18, 2018 broadcast.

6    There's a link to the YouTube video.  I believe it's in

7    paragraph 173.  I just wanted to bring Your Honor's attention

8    just for completeness of the record on MSNBC.

9           And it's a statement that's attributable, made during

10   the broadcast.  It was an MSNBC interview with Ari Melber in

11   which Mr. Nance states:  "within the intelligence community,

12   the thought was that he" -- referring to General Flynn -- "may

13   have been a turned agent to Russian intelligence," and it's --

14   that's within the one-year statute of limitations.

15          THE COURT:  Yeah, but as you know, I mean, look,

16   we're not going to get -- this case is not about Mr. Flynn.

17   This case is about your client, and there's no question that

18   anybody who's reading these articles fairly, without any kind

19   of, you know, bias or orientation, would say these -- if it

20   were asked of, like, a high school student:  Read this article

21   and tell us what the point of the article is, every one of them

22   is focusing on Flynn.

23          You may have used it in your papers or your client

24   may have used it in one of her comments in that BBC interview,

25   I'm not sure, but wherever it was, I believe somewhere in the

1   papers, there's a reference to the fact that the plaintiff was,

2   if anything, sort of collateral -- was collateral damage.   I

3   think that's the only appropriate way of looking at these

4   articles.

5          I mean, these articles were focusing on, on Flynn.

6   And many of the articles, although they do reference this

7   meeting at Cambridge, they are also pointing to other -- many

8   other activities by Flynn with Russian authorities.   I mean, he

9   had dinner with Putin and all that sort of stuff.

10          The other thing is that simply, you know, a real

11   legitimate issue is that anybody in the position that Flynn had

12   as the director of the DIA knows that the normal protocol is if

13   you have any contact with a foreign national, especially a

14   foreign national of a country with whom the United States has

15   strained relations, that's supposed to be reported, and that's

16   discussed in some of these articles.

17          Now, there's a dispute as to whether, you know,

18   meeting somebody at a dinner is enough of a contact, but it is

19   interesting, you mentioned -- it's mentioned in the papers, and

20   I don't think it's being contested, that there was a 20-minute

21   interaction between your client and Mr. Flynn, and we've been

22   in court now 40 minutes, so about half of the time we've been

23   in court, and we've done a lot, in just half of the time,

24   that's a fairly long interaction.   Now, there were other people

25   present.   That's fine.

1          All I'm saying is that if you read these articles and

2   you read them in totality, it's clear that your client in many

3   of them isn't even mentioned by name, and that what is

4   discussed is either opinion, that is, two people were concerned

5   about this, or are actually factually correct.

6          The only real inaccuracies that I can see from here

7   are the inaccuracy that your client actually approached Flynn.

8   That does not appear to be the case.  But that is such a benign

9   statement by itself, that doesn't say anything.

10          So I think you really have an uphill battle on

11   showing the Court that any of the comments that are within the

12   statute of limitations would qualify as defamation.  So I'll

13   give you a few minutes to address that.

14          MR. BISS:  Judge, the, the question is what is the

15   gist of the articles, and as the Court knows, you have to look

16   at everything that's written in the articles.

17          THE COURT:  Well, wait.  If you're talking about the

18   gist of the article, I just said I think that any, any fair

19   reader of the English language who looked at this would say

20   it's Flynn and it's whether or not he has been compromised

21   because of his connections to Russia.  I mean, I think that's

22   the clear view.

23          MR. BISS:  But within the context of my client, which

24   is what these articles are about --

25          THE COURT:  No, your client -- the articles are not

1    about your client.  They're about Flynn, and your client is

2    peripheral, the same way Andrews is a peripheral.  There are

3    other people who are named in these articles who are

4    peripherally involved in the overall story, but the story

5    focuses on Flynn.

6            MR. BISS:  Judge, the overall narrative -- I think I

7    agree with Your Honor to the extent that the overall narrative

8    here is that there was collusion between Flynn and the

9    Russians, and the Russians in this case is my client.  That's

10   the Russian who is accused of colluding with Flynn.

11           The statements that are made here are, are -- the

12   articles are laden with, with facts.  For instance, there,

13   there is reference to Ms. Lokhova as being a foreign stranger

14   in *The New York Times* article.  There is reference to her

15   working for a Russian state-controlled bank.

16           The impression that the authors of the articles want

17   to give to the reader is that Ms. Lokhova was either a Russian

18   official, which she wasn't, which is false, or that she was

19   part of Russian intelligence, which she wasn't, which is false,

20   and that she got so close to Flynn that it alarmed or it caused

21   reports to be made, as they said in both *The Wall Street*

22   *Journal* article and *The New York Times* article, reports made to

23   the U.S. intelligence which were not made to the U.S.

24   intelligence community.

25           There was no closeness.  We've alleged why there was

1   no closeness.  We've also alleged that in the -- we've also

2   alleged facts which would show that the whole idea of there

3   being any alarm or any concern of any kind relating to this

4   February dinner, which is the -- which is the event, this

5   February dinner, is obviously untrue because she continued to

6   have interaction in the Cambridge Intelligence Seminar with

7   American intelligence officials.  They continued to allow her

8   to be intimately involved in, in publishing papers, and no one

9   raised any concerns whatsoever about it.

10          But these articles paint the, the picture that she

11  was acting as a Russian agent or, as they say, a Russian

12  intelligence official or a Russian official, and that she

13  approached General Flynn with the -- that she sat next to him,

14  she approached him, and that the, the gist is that she did it

15  for the purpose of compromising him, and that's what is so

16  defamatory about this is their portrayal of her acting on

17  behalf of the Russian government or being a Russian

18  intelligence officer, getting close to Flynn and compromising

19  him.

20          The overall narrative here is that, that, that -- the

21  narrative that they painted was that Flynn was compromised by a

22  Russian, and that's, that's the connection that's made to my

23  client.  That's the, the connection here.  There's other -- and

24  I think that, that theme flows through each of the, each of the

25  articles.

1          But, Judge, when you look at all the words that were,

2   were used, *The New York Times* article refers to anomalous

3   behavior.  It identifies her as being an employee of a

4   Russian-controlled state bank.  It says that the contact --

5   suggests that the contact was the subject of an FBI

6   wide-ranging counterintelligence probe into contacts that the

7   Trump campaign personnel may have had with Russian officials.

8          It portrays her as being something other than what

9   she was, which was just an academic.  And she went to a dinner

10  that she was invited to go to, there's no -- there's nothing in

11  the articles that would put any, any real truthful context in

12  in terms of why she was there at that dinner.  She's invited to

13  that dinner, and it was all pre-reported, as we allege, to the

14  DIA, to Flynn's -- who Flynn worked for, who Flynn directed.

15         This was all pre-reported.  There's no secrecy in

16  here.  So when they, when they, when they state in here that

17  there was anomalous behavior, that it came to the attention of

18  U.S. intelligence, in *The New York Times* article where they say

19  that the concern was, was strong enough that it prompted a

20  person to pass on a warning to American authorities that Flynn

21  could be compromised by Russian intelligence, she's not Russian

22  intelligence.

23         Nothing happened at that dinner.  The, the statements

24  that are made are false, and the implications that, that arise

25  from the statements are false as well, and that's why we allege

1    that it carries a defamatory meaning.

2            Because the implication, Judge, is clear that she did

3    something at this dinner.  And yes, she had, as you pointed

4    out, there was a 20-minute conversation.  It was, it was in

5    front of everybody.  Everybody was -- it was like a cocktail

6    conversation after dinner.  That's, that's what the

7    conversation was.

8            And so that -- how that gets spun into that she's --

9    she could have compromised him is, is -- that shows that it's

10   defamatory.  You could not possibly take from the fact that

11   they had a 20-minute public conversation, you couldn't possibly

12   derive from that the idea that she had done something to

13   compromise her -- to compromise General Flynn.

14           And again, she's the plaintiff in this case, not

15   General Flynn.  She's the plaintiff, but it is her -- it's the

16   fact that she is consistently and continually associated with

17   this idea that he's been compromised and that she's the one who

18   has done it, that's, that's what is defamatory about this,

19   because the 20 minutes was it.

20           THE COURT:  All right, thank you.

21           MR. BISS:  Thank you.

22           THE COURT:  All right, who wants to start the

23   defense?

24           MS. HANDMAN:  Yes, Your Honor, thank you.  You are

25   totally correct, Your Honor, that the focus of *The Washington*

1   *Post* article was indeed Flynn.  The actual sentence is:

2   "During a dinner Flynn attended, Halper and Dearlove" --

3   another academic -- "were disconcerted by the attention the

4   then-DIA chief showed to a Russian-born graduate student who

5   regularly attended the seminars, according to people familiar

6   with the episode."

7       Nowhere does it say or suggest that she did any

8   activity whatsoever.  They were concerned about his conduct,

9   his attention to her.  Nowhere does it say that she did

10   anything wrong and that they were concerned about it.

11       Indeed, the fact that she says Mr. Dearlove went on

12   to continue with her at Cambridge exactly is the point.  We

13   didn't say Mr. Dearlove was disconcerted by her conduct.  We

14   said she was disconcerted by the attention Flynn paid to her.

15   That's consistent with his continuing to respect her, and we

16   didn't say otherwise.

17       We did not say that this was reported to the

18   authorities.  We did not say she worked for a Russian-owned

19   bank.  We simply called her a Russian-born grad student, which

20   is 100 percent true.  We didn't even name her.  It's a question

21   of whether it's even of and concerning her.

22       *The Post* has never written about her except in July

23   of this year, when Congressman Nunes, a client of Mr. Biss's,

24   referred to her during the Mueller testimony.

25       This is not someone that has been on *The Post* radar,

1   and indeed, the article really was about Stefan Halper.  This

2   was a very, you know, one line basically in this story.

3           So -- and the word "disconcerted" itself is of

4   subjective opinion.  It is a subjective viewpoint, as the case

5   that -- *Hyland* that Mr. Biss cites, and that is opinion because

6   it can't be proven true or false whether they were disconcerted

7   or not.

8           Nor does it -- she says that, well, it was false

9   because Halper wasn't at the dinner.  Well, whether or not he

10  was at the dinner, he definitely was part of the seminar that

11  Flynn attended, and he could have heard about what went on and

12  been disconcerted, and indeed, the whole premise of the lawsuit

13  is that Halper is spreading his concerns about her to

14  everybody.  That's what is the, the main thrust of the lawsuit.

15          And so that, that he was disconcerted whether he

16  attended the dinner or not, A, it's not defamatory of her

17  whether he attended dinner; B, she confirmed in -- an article

18  of *The Times* of London said he attended.  She told *The Post*

19  when she sent that article everything in it, in it was

20  accurate.

21          But it really is immaterial whether he attended it or

22  not.  He could still be disconcerted, as was Mr. Dearlove, by

23  Flynn's attentions, not her conduct.

24          And if I might briefly talk about the MSNBC tweets

25  that are, you know, within the statute of limitations, both of

1   them are not actionable either.  One is clearly not of and

2   concerning her.  If you read the tweet chain, which we've put

3   in as an exhibit, Mr. Nance starts with a *Washington Post*

4   article about Maria Butina, a Russian who has been charged with

5   being a foreign agent, and the rest of the article -- tweets

6   are all about that.

7         And someone says to him, "Shall we call her a

8   sparrow?"

9         And there is where Mr. Nance impishly says, "The

10   technical term for sexy women agents is a 'Svetlana.'  Smart

11   ones are 'Natashas.'"

12         And then the tweet goes on with another picture of

13   Maria Butina and a cartoon of Natasha the spy from Rocky &

14   Bullwinkle.

15         Clearly, referring to a Svetlana is not referring to

16   this Svetlana, and it is more or less a joke and, you know,

17   very -- the casual tweet kind of conversation that you would

18   expect, and it's clearly not about the plaintiff.

19         The other tweet that is in issue again starts with

20   Maria Butina, and there's a lot of tweet conversation back and

21   forth, and again, it refers to -- someone else raises, "Flynn

22   and Lokhova?"

23         And Mr. Nance responds with a two-word tweet, "Very

24   likely."

25         That again is not actionable because it is

1    speculative supposition.  That's exactly the language that the

2    Fourth Circuit used in the *Biospherics* case and held that that

3    is not an actionable statement of fact.  That's clearly

4    nonactionable opinion.  Theory, conjecture, surmise is not

5    actionable opinion, and in the context of the tweet in

6    particular, where as one quote said, it's freewheeling,

7    anything goes, and the breezy tone, it's clearly not meant as a

8    statement of fact; it's speculation.  So these are both

9    nonactionable.

10          And if I might just add one last point, the party

11   here is NBC.  Mr. Nance, when they read our first motion to

12   dismiss, they amended the complaint to add Mr. Nance.

13   Mr. Nance, no summons has been issued to him.  He's not

14   currently a party.  I'm not here on his behalf.  I'm not his

15   counsel.

16          I will say all the reasons why this is not actionable

17   against NBC is the same -- applies equally to Mr. Nance, but

18   he's not present.

19          THE COURT:  All right.

20          MS. HANDMAN:  But NBC has two additional argument --

21   well, two additional arguments.  One is that they're not

22   vicariously liable for Mr. Nance's personal tweets.  It was on

23   his own account, not MSNBC's Twitter account, not NBC's Twitter

24   account.  It made no reference to them.  It linked to no

25   broadcast, in no way promoted MSNBC or NBC.

1          It was his personal Twitter feed, and a conversation

2   essentially between him and his followers is how this all came

3   up, and that's sort of the social media equivalent of by the

4   water cooler -- a conversation by the water cooler, which the

5   Fourth Circuit in an excellent opinion by Judge Wilkinson last

6   year, a unanimous opinion, held that that's exactly the kind of

7   talk that you can't expect employers to be policing and

8   proctoring what employees say.

9          And Mr. Nance is not even an employee.  I would add

10   he is a freelancer, a paid contributor, one of over 120 paid

11   contributors on NBC.

12          You wouldn't expect NBC to be able to keep track of

13   all the social media by all of those contributors, and as

14   Wilkinson said, it would have a -- very draconian restrictions

15   on speech if employers could control these conversations that

16   are not part of their job.

17          And the final thing I would say for both *The*

18   *Washington Post* and, and NBC, we have invoked Virginia's new

19   immunity statute, which applies both to the defamation claim

20   and the tortious interference claim and provides an immunity

21   for matters of public concern, which the plaintiff agrees this

22   matter is of public concern, and the immunity attaches unless

23   the plaintiff can show that it was published with actual or

24   constructive knowledge of falsity or in reckless disregard, so

25   essentially the actual malice standard, and they had not pled

1    that and they cannot plead it.

2         If you just take the list of prior publications from

3    reputable publishers, that in and of itself precludes a finding

4    of actual malice as a matter of law is what the D.C. Circuit

5    said in the *McFarland* case.  That's what we have here, a litany

6    of that, and there's nothing really that contradicts the fact

7    that they did not know anything they said was false, for all

8    the reasons that we've said.

9         And in the few of the -- in the -- they say, well,

10   David Ignatius decided not to publish that the plaintiff had an

11   affair with Mr. Flynn.  Well, *The Washington Post* didn't

12   publish that the plaintiff had an affair with Mr. Flynn.  So

13   there is nothing there to suggest any knowledge of falsity

14   about anything that they actually published.

15        And that -- if the Court decides to dismiss, then

16   we'd also ask for fees under that Virginia statute.

17        THE COURT:  All right.  Any other -- *The Washington*

18   *Post* is primarily involved in this argument because of the

19   statute of limitations.  I think the only other possibility is

20   *The New York Times* if the Court were to find that the hyperlink

21   brought you within it.

22        Did you want to respond to that at all?

23        MS. GREEN:  Your Honor, do you want to hear from *The*

24   *Times* about the article?

25        THE COURT:  If you want to add anything that hasn't

1    already been argued.

2              MS. GREEN:  Not particularly, Your Honor.  I think

3    Your Honor's characterization of the articles and the reasons

4    why they're not actionable is exactly on point.

5              We've raised three, three points in our papers:  that

6    the words themselves don't rise to a defamatory meaning; that

7    they essentially convey the subjective opinions of two unnamed

8    sources; and that as a matter of law, it's not of and

9    concerning Ms. Lokhova.

10             Taken together and in the context of the article,

11   which was really about an unnamed FBI source's activities which

12   the president had criticized heavily and which were

13   controversial and a matter of very significant public interest,

14   what those activities were, whether they were appropriate or

15   inappropriate, *The Times* in closing, in describing what the

16   source's activities were, mentioned that the source had also

17   had contact with Flynn.

18             The focus of that reporting, the thrust of that

19   reporting was about the source and about Mr. Flynn.  In order

20   to convey the kind of contact that he had had and the kind of

21   concerns that he had conveyed, the article mentioned what the

22   nature of those contacts and concerns were, but those were,

23   frankly, innocuous and boil down to two sentences:  that the

24   source was, quote, alarmed by the general's apparent closeness

25   with a Russian woman who was also in attendance, and that the

1    concern was strong enough that it prompted another person to

2    pass on a warning to the American authorities that Mr. Flynn

3    could be compromised by Russian intelligence according to two

4    other people familiar with the matter.

5            And as I said, our argument is first that the fact

6    that someone subjectively may have felt alarm or concern does

7    not convey a defamatory meaning about the unnamed women, that

8    Mr. Biss has raised in his opposition an implication argument.

9    We don't believe that the innuendo that he argues for is

10   sustainable based off of those words; and moreover, under

11   *Chapin* and *White* in this jurisdiction, there must be some

12   showing that the defendant intended or endorsed the, the

13   interpretation and innuendo that he suggests, that this woman

14   was an agent, that, that she was working for Russian

15   intelligence.

16           We don't believe that that is sustainable or that *The*

17   *Times* conveyed that meaning.  We would agree that the focus

18   here is on whether or not Mr. Flynn's activities were, were

19   reasonable or appropriate.

20           Third, that the opinion expressed here, what concerns

21   one person or alarms one person doesn't concern or alarm

22   another, and Mr. Biss has argued that nothing that his client

23   did was, was inappropriate or unprofessional.  That may very

24   well be.  Based upon her own description of this interaction,

25   based upon the undisputed record of this interaction, it is, I

1   think, clear how two people could potentially view it

2   differently with different contexts, and whether or not that

3   was appropriately a cause for concern or not is precisely the

4   kind of relative and subjective opinion that is subject

5   to protection is not actionable under precedent in this

6   jurisdiction and elsewhere.

7          And lastly, in terms of the "of and concerning" as a

8   matter of law, the article, aside from saying that there was a

9   Russian woman who attended the unspecified event, there's no

10  other information about this person.  *The New York Times*

11  article does not even convey whether or not the woman was an

12  academic or associated with Cambridge.  It simply identifies

13  her nationality, which is germane to why, why someone might

14  have formed some opinion about whether or not Russian

15  intelligence could have an opportunity to, to compromise Flynn,

16  and therefore, it is simply not reasonable to say that a reader

17  would have concluded that that vague allusion was a specific

18  academic at Cambridge University.

19          THE COURT:  All right, thank you.

20          MS. GREEN:  Thank you, Your Honor.

21          MR. REED:  Your Honor --

22          THE COURT:  Yes, sir.

23          MR. REED.  Go ahead.

24          MR. BERLIN:  I take it -- I'm sorry to interrupt.  I

25  take it you would like not to hear from *The Wall Street Journal*

41

1  because of the statute of limitations issue?

2           THE COURT:  I don't need to hear from you.

3           MR. BERLIN:  I understand.

4           MR. REED:  Your Honor, Terrance Reed again on behalf

5  of the defendant Halper, and I agree with the prior comments,

6  and I'd like to focus solely on the issue of *The Post* article

7  and to, to point out one additional point, which is that the

8  article talks about some unidentified third party observing

9  Mr. Halper and Mr. Dearlove at this dinner.

10          It's not a -- that's not a statement by Mr. Halper.

11  It's a statement at best of an unidentified third party that he

12  looked across the table and, and had the subjective opinion

13  that Mr. Halper and Mr. Dearlove looked disconcerted.

14          Obviously, we agree that that's just an opinion.

15  It's an opinion of a third-party observer, and it's not a

16  statement at all of this defendant.  Thank you.

17          THE COURT:  All right.  All right, Mr. Biss, do you

18  want to respond briefly?  Because I have a criminal matter

19  starting in a few minutes.

20          MR. BISS:  Yes, Your Honor, just briefly.  Judge, the

21  one thing that's overlooked here is the, is the fact that there

22  are allegations in the complaint that these statements are

23  false.  Number one, the allegation in *The New York Times*

24  article is that Halper is one of the persons that's identified

25  as the people familiar with the matter.  We allege that, and it

42

1    becomes, it becomes clear given the context of the rest of the

2    article.

3                They say, "The concern was strong enough that it

4    prompted another person to pass on a warning to the American

5    authorities that Mr. Flynn could be compromised by Russian

6    intelligence . . .."

7                None of that's true.  Not a single part of that

8    sentence is true.  There was no concern, and that can be

9    proven, provably false.  There was no concern expressed by

10   anybody at that February dinner, none.  Not a single one.

11   Nothing was -- nothing prompted anyone to pass on anything to

12   U.S. intelligence.

13               And all of the statements that are made in *The New*

14   *York Times* article, in the parts of the MSNBC argument that are

15   within the statute of limitations, for instance, there's an

16   allegation that after May of 2018, an MSNBC employee said --

17   was laughing and informed the executive producer:  "Everyone at

18   the CIA knows Flynn had an affair with Lokhova."  So there's

19   allegations there that are defamatory.

20               The statement in July of 2018 that -- where Mr. Nance

21   refers to Ms. Lokhova as a honey pot, these are, these are

22   words that have incendiary meaning.  When you accuse somebody

23   of being a honey pot, that means you accuse them of trying to

24   corrupt an American official.

25               And then Nance doesn't just, doesn't just respond.

43

1    He says -- when the, when the poster says:  "Flynn and

2    Lokhova?" asking who he's referring to, and he says:  "Very

3    likely," that implies a knowledge of a set of facts that would

4    connect my client to this honey pot, to being a honey pot in

5    connection with Flynn.

6            It's more than just some amorphous statement.  He's

7    actually -- and he holds himself out as being an intelligence

8    analyst with 25 years' experience, and he's telling people

9    based on his experience, it's very likely that she's a honey

10   pot.

11           And, Judge, I would just submit that in opposition,

12   that's clearly more than just some innocuous statement.

13           Then on December 18, the MSNBC also publishes a

14   statement, again it's on national television:  "Within the

15   intelligence community, the thought was that General Flynn may

16   have been a turned agent to Russian intelligence."

17           The theme throughout these articles is that my client

18   is Russian intelligence or a Russian official and that she has

19   gotten close to the director of intelligence, Michael Flynn,

20   and she's done something that's caused this great alarm and

21   concern, and the fact is there was no alarm and concern.

22           This is a false narrative that was published to the

23   world and held out to the world for, for -- that injured my

24   client, and that's really the -- what this case is all about.

25           THE COURT:  All right.

1          MR. BISS:  Thank you, Your Honor.

2          THE COURT:  Thank you.

3          Well, obviously, as I started at the beginning, we

4  got this case on Monday, and from the argument, it clearly has

5  significant implications for First Amendment rights, for

6  personal rights of individuals who believe that they've been

7  defamed, and we're going to, obviously, want to give it careful

8  attention.

9          I will, though, because I don't want the parties

10  spending resources on discovery at this point, and I'm not sure

11  where Judge Ellis had left this case, but because I'm going to

12  be taking these motions under consideration and it will take a

13  while to get an opinion to you, I'm putting the case on hold.

14  No discovery, no further expense incurred in this case.

15          We'll get an opinion out to you as soon as possible.

16  Thank you.

17          MS. HANDMAN:  Thank you, Your Honor.

18          MS. GREEN:  Thank you, Your Honor.

19          MR. BISS:  Thank you.

20          THE COURT:  You're all free to go.  We'll call the

21  criminal docket next.

22                              (Which were all the proceedings

23                               had at this time.)

24

25

45

1                    CERTIFICATE OF THE REPORTER

2        I certify that the foregoing is a correct transcript of

3   the record of proceedings in the above-entitled matter.

4

5                                    _____/s/_____

6                                          Anneliese J. Thomson

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25